758 F.2d 897
 INSTITUTIONALIZED JUVENILES in Pennsylvania institutions for
the mentally ill and the mentally retarded, namely, Kevin
S.; Richard S.; James Paul M.; Raymond C.; William B.;
Francis B.; Maria L.; Thomas W.; Nancy Louise D.; Gina
S.; and George S., by their next friend and guardian ad
litem, David Ferleger, individually and on behalf of all
others similarly situated, Appellees in No. 83-1696,
Cross-Appellants in No. 83-1722
v.
SECRETARY OF PUBLIC WELFARE, Commonwealth of Pennsylvania,
Frank Beal; John Fong, Director of Haverford State
Hospital; Nicholas D'Aluisio, Director of Polk State School
and Hospital; C. Duane Youngberg, Director of Pennhurst
State School and Hospital, sued as representative of all
others similarly situated, Appellants in No. 83-1696,
Cross-Appellees in No. 83-1722.
 Nos. 83-1696, 83-1722.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 10, 1984.
Decided March 26, 1985.
 
 Allen C. Warshaw (argued), Deputy Atty. Gen., Harrisburg, Pa., for appellants in No. 83-1696, cross-appellees in No. 83-1722.
 Herbert B. Newberg (argued), Philadelphia, Pa., David Ferleger, Philadelphia, Pa., for appellees in No. 83-1696, cross-appellants in No. 83-1722.
 TABLE OF CONTENTS
 Page
 I. THE UNDERLYING LITIGATION ....................................... 901
 A. Plaintiffs' Original Complaint ............................... 901
 B. The 1973 Regulations ......................................... 903
 C. Three-Judge Court Decision ................................... 903
 D. The 1976 Act and Regulations ................................. 904
 E. The 1977 Decision by the Supreme Court ....................... 905
 F. The Second Three-Judge Court Decision ........................ 905
 G. The 1978 Regulations ......................................... 906
 H. The 1979 Decision by the Supreme Court ....................... 906
 II. PLAINTIFFS' PETITION FOR COUNSEL FEES ........................... 907
 A. The Nature of the Request .................................... 907
 B. The Proceedings in District Court ............................ 908
III. DISCUSSION ...................................................... 909
 A. The Plaintiffs' Eligibility for Counsel Fees ................. 910
 1. Prevailing Party Status ................................... 910
 a. Statement of the Test .................................. 910
 b. Application of the Test ................................ 912
 2. Causation ................................................. 916
 3. Conclusion ................................................ 917
 B. The Disallowance of Fees for Hours Expended After the Full
 Extent of Relief Was Obtained, and the Use of the Hensley
 Reduction Factor ............................................. 918
 1. The Hensley Decision ...................................... 918
 2. The District Court's Complete Disallowance of Hours ....... 919
 3. The District Court's General Reduction of the Lodestar .... 920
 C. The Use of Enhancement Multipliers ........................... 921
 D. The Fee Award for Preparing the Fee Petition ................. 924
 E. The Failure to Award Fees for Work as Guardian Ad Litem ...... 925
 F. The Award of Costs ........................................... 926
 G. Post-Judgment Interest ....................................... 927
 IV. CONCLUSION ...................................................... 927
 Before SEITZ, HUNTER, BECKER, Circuit Judges.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 These appeals require us to review a comprehensive award of counsel fees under 42 U.S.C. Sec. 1988 (1982) against the Commonwealth of Pennsylvania in a protracted civil rights case dealing with procedures for admitting mentally ill and mentally retarded juveniles to mental health facilities. Both sides appeal virtually all aspects of the fee award. The appeal and cross-appeal present numerous questions, spanning the burgeoning jurisprudence of counsel fees. The appeals present particularly difficult questions concerning prevailing party status and the use of both negative and enhancement multipliers.
 
 
 2
 For the reasons that follow, we shall vacate the district court's judgment and remand the case to the district court for further proceedings consistent with this opinion.
 
 I. THE UNDERLYING LITIGATION
 
 3
 Because these appeals present challenges to a fee award that are directly related to the history of the litigation, particularly in terms of the extent to which the plaintiffs are prevailing parties, we must trace in detail the course of the underlying litigation and the results it allegedly achieved.
 
 A. Plaintiffs' Original Complaint
 
 4
 On November 16, 1972, six named plaintiffs filed a class action suit on behalf of all persons 18 years of age or under who have been, are, or may be committed to mental health facilities in Pennsylvania under sections 402 and 403 of the Pennsylvania Mental Health and Mental Retardation Act of 1966 ("1966 Act") (codified at Pa.Stat.Ann. tit. 50, Secs. 4402 & 4403 (Purdon 1969)).[1]
 
 
 5
 The original action, Bartley v. Kremens, C.A. No. 72-2272, was brought against the Director of Haverford State Hospital, the Secretary of Public Welfare of the Commonwealth, and the Deputy Secretary for Mental Health and Mental Retardation of the Department of Public Welfare. Plaintiffs challenged the portion of the 1966 Act concerning "voluntary" admissions and commitments of mentally ill and retarded juveniles to mental health facilities.[2] Plaintiffs alleged that those provisions, which enabled a parent or guardian to admit or commit a juvenile to care without the juvenile's approval if a medical examination indicated a need for care or observation, violated the due process clause and equal protection clause of the fourteenth amendment to the United States Constitution.
 
 
 6
 Plaintiffs alleged that they had a constitutional right to a full panoply of procedural safeguards prior to any admission or commitment to a state mental health facility. The rights asserted were: (a) the right to notice; (b) the right to a pre-admission hearing; (c) the right to counsel (including appointment of counsel for indigent juveniles); (d) the right to present evidence and testimony; (e) the right to subpoena witnesses and documents; (f) the right to confront and cross-examine witnesses against them and those favoring commitment; (g) the right to independent expert examination and assistance; (h) the right to involuntary commitment only after the decision of an impartial decision-maker; (i) the right to involuntary commitment only when clear and convincing evidence indicates that there is a need for care or observation; and (j) the right to appellate review, including appointment of counsel and a free hearing transcript if indigent. It is important to recognize as a general matter that the relief sought by plaintiffs related only to the procedures for admitting an individual to a mental health facility. The requested relief did not suggest in any way that the plaintiffs were challenging the quality of care provided to juveniles once they were admitted to facilities. The scope of relief sought by plaintiffs is critical when assessing plaintiffs' status as prevailing parties. See infra part III.A.1.
 
 
 7
 A three-judge court was convened to hear the case pursuant to 28 U.S.C. Sec. 2281,[3] and the case was listed for trial.
 
 B. The 1973 Regulations
 
 8
 Before the case reached trial, the Secretary of Public Welfare promulgated regulations, which became effective September 1, 1973, implementing the 1966 Act. See 3 Pa.Admin.Bull. 1840 (1973) ("1973 Regulations").[4] The regulations conferred limited procedural rights upon all juveniles. They required a referral from a pediatrician, general physician, or psychologist that included a specific psychiatric evaluation indicating why institutional care was warranted. Following admission of an individual, the regulations called for an independent examination at the direction of the institution's director and for discharge of the patient if the findings indicated that institutionalization was not necessary. Juveniles 13 and older were to be given notification of their legal rights, the telephone number of either the local public defender or legal services organization, and the ability to object to their continued institutionalization.
 
 
 9
 In sum, the 1973 Regulations provided generally that parents could not unilaterally admit a juvenile to a mental health facility. Admission would follow only after evaluation by a health care practitioner that was subject to full review by the director of the institution. Plaintiffs, however, continued to contend that the procedures, even as substantially modified by the regulations, did not comport with due process requirements.
 
 C. Three-Judge Court Decision
 
 10
 After a three-day trial in September and October, 1974, the three-judge court, with one judge dissenting, granted plaintiffs much of the relief sought. Bartley v. Kremens, 402 F.Supp. 1039 (E.D.Pa.1975). The court declared unconstitutional sections 402 and 403 of the 1966 Act and enjoined the Secretary from enforcing them. The court based this conclusion upon a finding that plaintiffs were entitled to the following procedural safeguards: (a) a probable cause hearing within 72 hours of an individual's initial commitment; (b) a post-commitment hearing within two weeks of the initial commitment; (c) notice of the hearing and the grounds for any proposed commitment; (d) counsel at all "significant stages of the commitment process" and free counsel if indigent; (e) the right to be present at the commitment hearing; (f) the right to be committed only after a finding of clear and convincing proof of its need; and (g) the right to offer evidence and witnesses in his or her behalf and to confront and cross-examine adverse witnesses. Id. at 1053-54.
 
 
 11
 Defendants appealed this decision and the Supreme Court noted probable jurisdiction on March 22, 1976. Kremens v. Bartley, 424 U.S. 964, 96 S.Ct. 1457, 47 L.Ed.2d 731 (1976).
 
 D. The 1976 Act and Regulations
 
 12
 On July 9, 1976, before the Supreme Court heard oral argument in Kremens, the Commonwealth enacted the Mental Health Procedures Act ("1976 Act"), Pa.Stat.Ann. tit. 50, Secs. 7101-7503 (Purdon Supp.1984). The 1976 Act specifically repealed the 1966 Act with respect to all persons except those who are mentally retarded. See id. Sec. 7502. The 1966 Act continued in force for all mentally retarded persons.[5] The Commonwealth thus created two statutory schemes: one for mentally retarded persons (the 1966 Act and 1973 Regulations) and one for mentally ill persons (the 1976 Act).
 
 
 13
 Article II of the 1976 Act, Pa.Stat.Ann. tit. 50, Secs. 7201-7207 (Purdon Supp.1984), established new rights and procedures for voluntary examination, admission, and treatment of all mentally ill persons in the Commonwealth. First, the 1976 Act lowered to 14 years of age at which a parent or guardian may act on behalf of a juvenile and admit him or her to a facility without the juvenile's permission. Id. Sec. 7201. It thus treated all mentally ill individuals 14 years old or above as adults. Second, the 1976 Act contained additional procedural safeguards for persons admitted voluntarily to mental health facilities. The Act ensured that the consent granted by a patient who seeks voluntary admission (or by the parent in the case of minors under 14) is truly informed.[6] Parents or guardians may object to the voluntary commitment of minors between 14 and 18 years old, in which case a hearing will be held within 72 hours.[7]
 
 
 14
 Once an individual of any age is admitted he or she must be given a physical examination and provided with an individualized treatment plan within 72 hours. See id Sec. 7205. The 1976 Act also sets forth specific procedures for withdrawal from voluntary treatment. Persons 14 years old and over may withdraw at any time in most circumstances. Persons under 14 years old may be released by their parent or guardian, and any other "responsible party" may petition the Juvenile Division of the court of common pleas to effect the child's release, in which case counsel shall be appointed and a hearing must be held within 10 days. See id Sec. 7206.
 
 
 15
 Finally, the 1976 Act seeks to ensure that any person admitted to a mental health facility will be released from treatment as soon as such treatment is no longer necessary. Specifically, the Act requires that the facility conduct a reexamination and review of the treatment plan every 30 days, id. Sec. 7108(a), and provides that an individual shall not remain "in treatment or under any particular mode of treatment for longer than such treatment is necessary and appropriate to his needs." Id. Sec. 7108(b).
 
 
 16
 On September 4, 1976, the Secretary adopted implementing regulations. 6 Pa.Admin.Bull. 2115 (1976) ("1976 Regulations").[8] Two aspects of the new regulations appear to expand the procedural rights of individuals admitted to a mental health facility. First, the regulations establish an appeal system for considering objections by an individual to his or her treatment plan. See id. at 2117, Sec. 7100.1.6.4. This provision is very important because, under the 1976 Act, the treatment plan is reviewed every 30 days and an individual must be released when it is determined that treatment is not needed. By allowing an individual to object to a treatment plan in a formal manner, this provision helps to ensure that a juvenile will be treated at a facility for no longer than necessary. Second, the 1976 Regulations establish a "Bill of Rights" for patients of mental institutions, describing and guaranteeing rights to private communication, access to an attorney, involvement in the development and review of the treatment plan, and care in the least restrictive environment. See id at 2119. This aspect of the 1973 Regulations is less important because it concerns only the quality of care provided at a facility.
 
 
 17
 E. The 1977 Decision by the United States Supreme Court
 
 
 18
 The Supreme Court decided the appeal on May 16, 1977, Kremens v. Bartley, 431 U.S. 119, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977). The Court noted that each of the named plaintiffs was over 14 years of age and mentally ill. It then concluded that because the 1976 Act provided that mentally ill persons 14 and older would be admitted to mental health facilities as adults, the named plaintiffs' claims were moot. Id. at 128-29, 97 S.Ct. at 1714-15. The Court also decided that the remaining members of the class were affected in such a variety of ways by the 1973 Regulations and the 1976 Act, depending upon their age and mental impairment, as to make a decision on the merits inappropriate.[9] The Court therefore vacated the district court's judgment and ordered substitution of named plaintiffs and reconsideration of the class definition in order to obtain a class with live claims. Id. at 134-37, 97 S.Ct. at 1717-19.
 
 F. The Second Three-Judge Court Decision
 
 19
 On remand, pursuant to leave, appellees presented the district court with an amended complaint that proposed a plaintiff class consisting of two subclasses: one of mentally ill juveniles under the age of 14 committed to a state institution under the 1976 Act; the other of mentally retarded juveniles age 18 or younger committed to a state institution under the 1966 Act and 1973 Regulations.[10] The amended complaint thus alleged that the 1966 Act, the 1973 Regulations, the 1976 Act, and the 1976 Regulations were all unconstitutional.
 
 
 20
 The district court, with one judge dissenting, found the set of procedural safeguards prescribed in the 1966 Act, 1973 Regulations, and 1976 Act unconstitutional on their face and enjoined their enforcement. Institutionalized Juveniles v. Secretary of Public Welfare, 459 F.Supp. 30 (E.D.Pa.1978).[11] The court held that its prior conclusions in Bartley concerning specific procedural rights, including the need for an automatic post-commitment hearing, were still valid and thus held that the Commonwealth's procedures violated due process standards. See id. at 43-45, 47.
 
 
 21
 Defendants once again appealed the decision of the three-judge court, and the Supreme Court noted probable jurisdiction on June 19, 1978. Secretary of Public Welfare v. Institutionalized Juveniles, 437 U.S. 902, 98 S.Ct. 3084, 57 L.Ed.2d 1132 (1978).
 
 G. The 1978 Regulations
 
 22
 Prior to oral argument before the Supreme Court, the Secretary promulgated new regulations further implementing the 1976 Act. 8 Pa.Admin.Bull. 2432 (1978) ("1978 Regulations").[12] The 1978 Regulations elaborated the Commonwealth's procedures concerning confidentiality of mental health records, see id at 2436-40, and included a "Manual of rights for patients in mental hospitals," id. at 2440, which discussed in great detail the specific rights to which patients are entitled. Included in this "manual" was a detailed grievance procedure that made appellate review available to any patient objecting to the general conditions of care at the facility. Id. at 2443-44.[13] Thus, the reforms included in the 1978 Regulations related to the quality of care at institutions.
 
 
 23
 H. The 1979 Decision by the United States Supreme Court
 
 
 24
 The Supreme Court consolidated the instant case for hearing with Parham v. J.R., a case challenging the constitutionality of Georgia's procedures for institutionalization of persons under 18 years of age. The court filed opinions on June 20, 1979, in both cases. See Parham v. J.R., 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979); Secretary of Public Welfare v. Institutionalized Juveniles, 442 U.S. 640, 99 S.Ct. 2523, 61 L.Ed.2d 142 (1979). In Parham, the Court concluded that parents should retain the dominant role in the decision to admit a mentally ill juvenile, but that their discretion is not absolute and thus that an independent decision by a state authority is required. Parham, 442 U.S. at 604, 99 S.Ct. at 2505. The Court then outlined the due process standard for the institutionalization of minors:
 
 
 25
 We conclude that the risk of error inherent in the parental decision to have a child institutionalized for mental health care is sufficiently great that some kind of inquiry should be made by a "neutral factfinder" to determine whether the statutory requirements for admission are satisfied. That inquiry must carefully probe the child's background using all available sources, including, but not limited to, parents, schools, and other social agencies. Of course, the review must also include an interview with the child. It is necessary that the decisionmaker have the authority to refuse to admit any child who does not satisfy the medical standards for admission. Finally, it is necessary that the child's continuing need for commitment be reviewed periodically by a similarly independent procedure.
 
 
 26
 Id. at 606-07, 99 S.Ct. at 2506 (footnotes and citations omitted).
 
 
 27
 In its opinion in Institutionalized Juveniles, the Court reviewed Pennsylvania's scheme as established by the 1966 Act, 1973 Regulations, 1976 Act, and 1978 Regulations. The Court examined separately the procedures for mentally ill juveniles and those for mentally retarded juveniles. It held that the regulatory scheme comported in all respects with the due process requirements set out in Parham. Institutionalized Juveniles, 442 U.S. at 649-50, 99 S.Ct. at 2527-28. The Court thus reversed and remanded the case for further proceedings. The district court subsequently entered judgment for defendants, terminated the class, and dissolved the three-judge panel. Institutionalized Juveniles v. Secretary of Public Welfare, 87 F.R.D. 463 (E.D.Pa.1980).
 
 II. PLAINTIFFS' PETITION FOR COUNSEL FEES
 A. The Nature of the Request
 
 28
 On August 20, 1975, plaintiffs moved to amend the district court's opinion and order in Bartley to include attorneys fees and costs under the Civil Rights Attorneys Fees Awards Act of 1976, 42 U.S.C. Sec. 1988 (1982), which permits a court to award attorney fees to the prevailing party in civil rights litigation. After the two appeals to the Supreme Court were completed, the district court on August 25, 1980, ordered plaintiffs to file all fee petitions and supporting memoranda. Plaintiffs filed affidavits shortly thereafter. They sought an award for David Ferleger, plaintiff's lead counsel, of $92,341, reflecting 1376.6 hours of legal work on the case from 1972 to 1981, billed at the historical hourly rates Ferleger used during that period.[14] Plaintiffs also requested fees for Ferleger to compensate him for work performed as guardian ad litem for the class. Additionally, plaintiffs sought fees of $3210 for 107 hours of work performed by Penelope A. Boyd in 1978 while she was a law student, and $9400 for 470 hours of work performed from 1972 to 1975 by other law students. Finally, plaintiffs applied for $12,392 to compensate Herbert Newberg for 92.2 hours spent preparing and litigating the fee petition from 1975 to the date of the district court's ruling on the fee petition.[15]
 
 
 29
 Plaintiffs also sought an award above the lodestar for the work of Ferleger, Boyd, and the law students. They requested that the court apply a multiplier to reflect the quality of the work performed, the extent of benefits achieved, the constitutional significance of the case, the contingent nature of the case, and the delay in payment to counsel. The requested multiplier was unspecified.
 
 
 30
 Both parties petitioned the court for an award of costs under Fed.R.Civ.P. 54(d). Plaintiffs sought $7,082 for expenses incurred by Ferleger and $136.46 for expenses incurred by Newberg. Defendants sought $2,034.15 in costs.
 
 B. The Proceedings in District Court
 
 31
 After hearing oral argument, the district court issued a comprehensive and thoughtful memorandum opinion on July 26, 1983. Institutionalized Juveniles v. Secretary of Public Welfare, 568 F.Supp. 1020 (E.D.Pa.1983). The court found that plaintiffs essentially succeeded on the merits because they received some of the benefits they sought when the Commonwealth enacted the 1973 Regulations, the 1976 Act, and the 1978 Regulations to protect mentally ill and retarded juveniles.[16]
 
 
 32
 The court further found that the litigation was a catalyst for these changes. Based upon this court's criteria in Ross v. Horn, 598 F.2d 1312 (3d Cir.1979), and NAACP v. Wilmington Medical Center, 689 F.2d 1161 (3d Cir.1982), the district court concluded that, despite the Supreme Court's entry of judgment in favor of the defendants, plaintiffs were a prevailing party for purposes of Sec. 1988 and thus were entitled to attorneys fees. The court decided, however, that plaintiffs were not prevailing parties as to any work performed after the promulgation of the 1978 Regulations. Because the Supreme Court had ruled that the Commonwealth's procedures as of the promulgation of the 1978 Regulations were constitutionally sufficient, the court concluded that the plaintiffs had received a mere "gratuitous judicial endorsement of legislative and administrative action," 568 F.Supp. at 1027, and that plaintiffs therefore had obtained no relief in the Supreme Court.
 
 
 33
 The court awarded the following fees and costs:
 
 
 34
 a. For the work performed by Ferleger, after eliminating the hours spent after 1978 on the merits of the case, reducing some of the hours spent prior to that date, and basing its calculation on Ferleger's historic hourly rates that reflect his growth in experience as an attorney from 1972 to 1978, a lodestar of $72,957.00 for work on the merits and $2,123.50 for work on the fee petition.[17]
 
 
 35
 b. for the work performed by Boyd and the other law students, no fee.[18]c. for the work performed on the fee petition by Newberg, after reducing some of the hours spent and accepting as reasonable the hourly rate Newberg used in his affidavit, a lodestar of $14,880.00.[19]
 
 
 36
 d. No award of costs to either party, based upon the discretion of the district court in deciding whether to make such an award. See Fed.R.Civ.P. 54(d).
 
 
 37
 The district court applied a multiplier of .25 to Ferleger's lodestar to compensate him for "the quality of his work, the contingent nature of the success at the outset as well as the importance of the constitutional provisions underlying this action." Id. at 1033. The court applied a further multiplier of .25 to compensate Ferleger for the delay in payment of the fee. The court, however, applied a reduction factor of 50, based upon its conclusion that plaintiffs' success in achieving all the relief they sought from the litigation was limited. The court concluded that the Supreme Court's ruling in Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) required such a reduction.[20] See 568 F.Supp. at 1032. The court also applied a Hensley reduction factor of .125 to Newberg's lodestar, concluding that Newberg did not attain complete success in the fee petition. This reduced the award for Newberg's services to $13,020.
 
 
 38
 The court thus awarded plaintiffs a total fee of $88,100.50 in an order dated July 26, 1983.
 
 III. DISCUSSION
 
 39
 The district court's award of attorney fees and costs is challenged in a variety of respects by both plaintiffs and defendants. Defendants appeal the entire award of fees to plaintiffs. Plaintiffs cross-appeal, challenging the district court's refusal to award fees for Ferleger's time spent on the merits after 1978, its application of the 50 percent discount to Ferleger's lodestar, its refusal to award a multiplier of greater than 25 percent for delay in payment, its refusal to compensate Ferleger for his work as guardian ad litem to the class, its application of a discount factor of .125 to Newberg's lodestar, its refusal to award costs to plaintiff, and its failure to award interest on the fee award. We consider these objections in this discussion section, which has been organized as follows: (A) the plaintiffs' eligibility for fees; (B) the disallowance of fees for hours expended after the full extent of relief was obtained and the use of the Hensley reduction factor; (C) the use of enhancement multipliers; (D) the fee award for litigating the fee petition; (E) fees for work as guardian ad litem; (F) the award of costs; and (G) post-judgment interest.[21]
 
 
 40
 A. The Plaintiffs' Eligibility for Counsel Fees
 
 
 41
 Defendants and plaintiffs both challenge the district court's basic conclusions on eligibility for attorney fees. Defendants argue that plaintiffs failed to show that they are prevailing parties, contending particularly that state regulatory changes did not provide any benefits sought by plaintiffs and that any benefits received by plaintiffs from the state legislature should not be considered benefits extended by defendants. Defendants also argue that plaintiffs have not demonstrated that the litigation actually caused the state's reform of admission procedures for institutionalized juveniles.[22] On the other hand, plaintiffs argue that the district court erred because it found that they had not prevailed in litigating the second appeal before the Supreme Court.
 
 
 42
 The method of determining eligibility for attorney fees under 42 U.S.C. Sec. 1988 (1982) is now well established: a court must decide whether plaintiffs are prevailing parties and whether there is a causal connection between the litigation and the relief obtained from the defendant. See, e.g., NAACP v. Wilmington Medical Center, Inc., 689 F.2d 1161, 1166-70 (3d Cir.1982), cert. denied, 460 U.S. 1052, 103 S.Ct. 1499, 75 L.Ed.2d 930 (1983). The Supreme Court in its decision in Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 1943, 76 L.Ed.2d 40 (1983), concluded that "the extent of a plaintiff's success is a crucial factor in determining the amount of an award of attorney's fees." Since a district court may "award only that amount of fees that is reasonable in relation to the results obtained," id., the two-part test of prevailing party status has to be applied in a more careful and comprehensive manner. Because this test focuses a court's attention on the benefits actually received and caused by plaintiffs, it will determine not only the often evident threshold question of eligibility for fees, but it will also be critical in determining the amount of a reasonable fee award, in that the final award must depend on a full assessment of the extent of the benefits received by plaintiffs.[23]
 
 1. Prevailing Party Status
 
 43
 (a) Statement of the Test
 
 
 44
 We have recently held that "[t]he standard used in this circuit for determining a plaintiff's prevailing party status is whether plaintiff achieved 'some of the benefit sought' by the party bringing the suit." NAACP v. Wilmington Medical Center, Inc., 689 F.2d 1161, 1167 (3d Cir.1982) (citing Bagby v. Beal, 606 F.2d 411, 415 (3d Cir.1979)), cert. denied, 460 U.S. 1052, 103 S.Ct. 1499, 75 L.Ed.2d 930 (1983). Defendants argue that in light of the Supreme Court's decision in Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), this standard is no longer proper. In Hensley, the Court stated that the prevailing party standard
 
 
 45
 has been framed in various ways. A typical formulation is that "plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." Nadeau v. Helgemoe, 581 F.2d 275, 278-279 (CA1 1978).
 
 
 46
 Id. at 1939 (footnote omitted).
 
 
 47
 We conclude that, by describing only a "typical" prevailing party standard and by attributing it directly to the First Circuit, the Supreme Court did not prescribe one uniform articulation of the prevailing party standard in Hensley. We nevertheless agree that the Court's discussion in Hensley would likely warrant a revision in our standard if Wilmington Medical Center were patently inconsistent with the court's "typical" formulation; however, we discern no such inconsistency. It is worth recalling that Wilmington Medical Center made specific reference to Nadeau in its statement of the standard, see 689 F.2d at 1167, and that the language of our standard is, in fact, a virtual quotation of a portion of Nadeau.[24] In light of these close similarities in origin and articulation, we conclude that specific adoption of the Nadeau formulation is unnecessary and we will continue to apply the Wilmington Medical Center standard.[25] See Lummi Indian Tribe v. Oltman, 720 F.2d 1124, 1125 (9th Cir.1983) (court considers it consistent with Hensley to find that plaintiffs prevailed because they "received some of the benefit that they sought in bringing suit"); see also Fast v. School District of City of Ladue, 728 F.2d 1030, 1032 n. 2 (8th Cir.1984) (en banc) (adopting the prevailing party standard set out in Hensley while recognizing that the court does not necessarily require use of the standard), rev'g 712 F.2d 379 (8th Cir.1983); cf. 1 M. Derfner & A. Wolf, Court Awarded Attorney Fees p 8.03, at 8-17 to 8-18 & n. 32.3 (1984) (suggesting that Hensley may allow a standard for prevailing parties more generous than Nadeau, but precludes a less generous standard). But see Kentucky Association for Retarded Citizens, Inc. v. Conn, 718 F.2d 182, 184-86 (6th Cir.1983) (post-Hensley case setting a standard that requires a prevailing party to "prevail" on "the central issue").
 
 
 48
 To apply the prevailing party standard, it is important first to identify the relief plaintiff sought and, in relevant cases, the legal theories on which the relief was based. Usually a common-sense comparison between relief sought and relief obtained will be sufficient to indicate whether a party has prevailed. See, e.g., Bonnes v. Long, 599 F.2d 1316, 1319 (4th Cir.1979) (look to the complaint to identify the conditions the suit sought to change, then use this as a benchmark to measure relief ultimately obtained). The focus of this analysis is on the relief actually obtained rather than on the success of the legal theories. See Abraham v. Pekarski, 728 F.2d 167, 175 (3d Cir.1984) ("Although Abraham did not prevail on each of his legal theories, he obtained the relief he sought," and so was entitled to attorney fees.), cert. denied, --- U.S. ----, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984); Bagby v. Beal, 606 F.2d 411, 415 (3d Cir.1979) (the "definition [of 'prevailing party'] focuses not on the substantive merits of the plaintiff's claims, but rather on the relief ultimately received by the plaintiff"). Thus, as one would deduce from this approach, a plaintiff is a prevailing party to the extent extrajudicial relief makes legal claims moot. See Ross v. Horn, 598 F.2d 1312, 1322 (3d Cir.1979) (plaintiffs were prevailing parties because changes in the law had mooted their claims), cert. denied, 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980); see also Doe v. Busbee, 684 F.2d 1375, 1379 (11th Cir.1982) ("[A] party may be considered to be 'prevailing' if the litigation successfully terminates by a consent decree, an out-of-court settlement, a voluntary cessation of the unlawful practice by the defendant, or other mooting of the case when the plaintiff has vindicated his right.").
 
 
 49
 Because the test focuses on the relief actually obtained, two other characteristics of the litigation are not decisive of prevailing party status. First, a plaintiff is able to prevail based on relief that the plaintiff may have asserted was inadequate during the course of the litigation. See Wilmington Medical Center, 689 F.2d at 1168-69. Also, a plaintiff may be a prevailing party even though judgment was actually awarded in favor of the defendant. See Ross, 598 F.2d at 1322 ("In assessing who is a prevailing party, we look to the substance of the litigation's outcome," and "refuse to given conclusive weight to the form of the judgment.").
 
 
 50
 Finally, plaintiffs will be prevailing parties even though the relief they obtained is not identical to the relief they specifically demanded, as long as the relief obtained is of the same general type. In terms of the facts of this case, the plaintiffs' achievement of significant post-deprivation procedural rights may make them prevailing parties despite their specific demand for pre-deprivation procedures. Thus, in Fast v. School District of City of Ladue, 728 F.2d 1030, 1033 (8th Cir.1984) (en banc), the Eighth Circuit concluded that the plaintiff was a prevailing party even though a court determined that she was entitled to only a post-lay-off hearing, after she had requested a pre-lay-off hearing in her complaint. The court concluded that "the important thing is what relief was awarded on the facts and the law, not what relief was expressly requested by the pleadings." Id. This approach is particularly appropriate when a court has identified the post-deprivation procedures as necessary for compliance with due process requirements. See id. ("[E]ven if the complaint is read not to request a post-lay-off hearing, the District Court held that plaintiff was entitled to such a procedure, and that the failure to afford it was unconstitutional. A party is entitled to whatever relief is appropriate under the proof....").
 
 
 51
 (b) Application of the Test
 
 
 52
 With this understanding of the test, we now consider whether plaintiffs were "prevailing part[ies]" under Sec. 1988. The district court concluded that the procedural changes adopted in the 1973 Regulations, the 1976 Act, and the 1978 Regulations provided plaintiffs and their class with at least some of the relief they had sought and that plaintiffs were therefore prevailing parties. Notwithstanding defendants' arguments that the series of reforms did not actually establish the procedures requested by plaintiffs, we affirm the district court's conclusion that the reforms resulted in significant benefits for plaintiffs and class members and that plaintiffs are prevailing parties under the Act. Nevertheless, because of our conclusions about the scope of the relief requested by plaintiffs, we do not agree with the district court's assessment of the actual extent of the benefits secured by plaintiffs.[26]
 
 
 53
 The scope of relief requested by plaintiffs in this case is particularly important because state mental health procedures were comprehensively reformed over a five-year period by the promulgation of two sets of regulations and the enactment of a statute. We are particularly concerned about the relevance of the 1978 Regulations to plaintiffs' complaint in this case, because the only incremental benefit of these regulations was the establishment of measures that would ensure a satisfactory quality of care for individuals admitted to state facilities, in contrast to the improvement in admission procedures, which was the principal problem addressed by the lawsuit. We believe that it is improper to conclude that the 1978 regulatory reforms benefitted plaintiffs in the absence of evidence that plaintiffs actually sought such reforms.
 
 
 54
 To determine the scope of relief sought by plaintiffs, we first consider the complaint. In both their initial and amended complaints, plaintiffs asserted that the fourteenth amendment required a hearing with full adversarial procedures before a neutral decisionmaker prior to the admission of a juvenile to a mental health facility. These procedures were advocated because admission of juveniles to mental health facilities involves the exposure of an individual not only to medical treatment, but also to a range of significant restraints on an individual's liberty. The Supreme Court, in fact, recognized that at least these interests were implicated by admission to a mental health facility when it stated that "a child, in common with adults, has a substantial liberty interest in not being confined unnecessarily for medical treatment.... We also recognize that commitment sometimes produces adverse social consequences for the child because of the reaction of some of the discovery that the child has received psychiatric care." Parham v. J.R., 442 U.S. 584, 600, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101 (1979).
 
 
 55
 The Supreme Court, however, rejected plaintiffs' demands for a pre-deprivation hearing requirement and concluded instead that the range of pre- and post-deprivation procedures provided by defendants was consistent with the due process standard. The Supreme Court's decision was based on the following three characteristics of the state's procedures: first, a juvenile may be admitted only when a pre-admission or immediate post-admission examination indicates that treatment is necessary, see Secretary of Public Welfare v. Institutionalized Juveniles, 442 U.S. 640, 647, 99 S.Ct. 2523, 2526, 61 L.Ed.2d 142 (1979) (mentally ill children may be admitted on parent's or guardian's application but there must be an examination within 72 hours evincing a need for treatment); id. at 648, 99 S.Ct. at 2527 (mentally retarded juvenile may be admitted only upon a physician's referral with an accompanying evaluation); second, a juvenile's status is reviewed at least once every 30 days to ensure that institutional care continues to be necessary, see id. at 647, 99 S.Ct. at 2526 (review for mentally ill children); id. at 649, 99 S.Ct. at 2527 (review for mentally retarded children); and third, procedures are established for terminating treatment at the facility that may be instituted either by the juvenile or by other responsible parties. See id. at 647, 99 S.Ct. at 2526 (three methods for releasing a mentally ill child); id. at 648, 99 S.Ct. at 2527 (various release procedures for mentally retarded juveniles). Thus, as we proceed to consider the extent to which plaintiffs were benefitted by the regulatory and statutory reforms, we feel constrained to identify as benefits within the scope of relief demanded by plaintiffs only reforms intended either (1) to ensure that juveniles would only be admitted to mental health facilities when care is necessary, or (2) to terminate care when care is no longer necessary.
 
 
 56
 This conclusion about the scope of relief sought by plaintiffs is also appropriate for two additional reasons. First, the Court's language strongly suggests that the quality of care received while a juvenile resides at a mental health facility is unrelated to whether the admission procedures comport with due process standards. See id. at 649-50 & n. 9, 99 S.Ct. at 2527-28 & n. 9 ("[w]e are faced only with the issue of what process is due at the initial admission, and thus we are not deciding what postadmission procedures are constitutionally adequate to continue a voluntary commitment."). Thus, the Court's analysis indicates that, as a legal matter, the adequacy of defendant's admission procedures does not depend on the fact that the state has also adopted procedures intended to ensure adequate care for residents of the facility. Second, the Court also suggests in dicta that plaintiffs' complaint was directed at remedying admission procedures rather than conditions of care once admission was warranted. See id. at 650 n. 9, 99 S.Ct. at 2528 n. 9. We agree with this assessment of plaintiffs' claim and conclude therefore that plaintiffs received a benefit from the defendants only to the extent that admission procedures, rather than general care procedures, were reformed.
 
 
 57
 Having determined the types of reforms that can fairly be said to benefit plaintiffs given the purposes of the litigation, we consider the regulatory and statutory reforms. We will organize our discussion by evaluating the revised admission procedures for the following three specific groups who comprised the plaintiffs' class: mentally retarded juveniles, mentally ill juveniles 14 and older, and mentally ill juveniles under 14 years old.
 
 
 58
 Procedures for the admission of mentally retarded juveniles were reformed by the 1973 Regulations. See supra section I.B. The Supreme Court discussed several of these reforms when determining that the admissions procedures passed constitutional muster.[27] Because these procedural reforms established that parents cannot unilaterally admit a retarded child to a facility and also that the medical evaluation on which admission is based will be reviewed by an independent director of a facility, we conclude that plaintiffs received significant benefits from the 1973 reforms. See also 442 U.S. at 648, 99 S.Ct. at 2527 ("The admission process [for mentally retarded juveniles] has been expanded significantly by regulations promulgated in 1973" (emphasis added)); Kremens v. Bartley, 431 U.S. 119, 125, 97 S.Ct. 1709, 1713, 52 L.Ed.2d 184 (1977) (1973 Regulations "substantially increased the procedural safeguards afforded to minors 13 years of age or older" (emphasis added)).
 
 
 59
 We turn to the 1976 Act and its impact upon procedures for the admission of mentally ill juveniles. First, procedures for the admission of mentally ill juveniles 14 and older were revised by the 1976 Act which "completely repealed and replaced the statutes challenged below, and obviated [such juveniles'] demand for a hearing, and other procedural protections, since the named appellees had total freedom to leave the hospital, and could not be forced to return absent their consent." Id. at 129, 97 S.Ct. at 1715. Thus, the 1976 Act provided that mentally ill juveniles aged 14 or over would be treated as adults and the Act "clearly moot[ed] the claims of the named appellees, and all others 14 or older and mentally ill." Id. As we discussed earlier, a plaintiff is a prevailing party to the extent extrajudicial relief moots a legal claim for relief. See Ross, 598 F.2d at 1322.
 
 
 60
 Procedures for the admission of mentally ill juveniles under 14 years old were also revised by the 1976 Act. The Supreme Court's discussion of these procedures indicates that several aspects of the Act were important to the conclusion that the procedures were constitutional. Specifically, the Court identified the requirements that a treatment team at the facility must determine whether inpatient treatment is necessary within 72 hours of admission to the facility (see Pa.Stat.Ann. tit. 50, Sec. 7205 (Purdon Supp.1984)), that the treatment plan for an individual must be reviewed at least once every 30 days (see id. Sec. 7108), and that there be several specific methods for gaining release of the juvenile (see id. Sec. 7206). See Institutionalized Juveniles, 442 U.S. at 647, 99 S.Ct. at 2526. In addition to these provisions in the Act, the Court's discussion also indicates that a procedure allowing an individual to appeal a decision regarding his or her treatment plan was of some significance to its conclusion that the new state procedures were constitutional. See id. This appeal procedure was included as section 7100.1.6.4 of the 1976 Regulations. 6 Pa.Admin.Bull. at 2117. Based on the foregoing analysis by the Court, we conclude that plaintiffs received significant benefits from the 1976 Act and 1976 Regulations.
 
 
 61
 The district court considered the impact of the 1978 Regulations along with the impact of the 1976 Act, see Institutionalized Juveniles, 568 F.Supp. at 1026, and concluded that these two reforms "did provide plaintiffs with procedural safeguards of which the plaintiffs did not have the benefit when they commenced this litigation." Id. The plaintiffs agree with this analysis and seek to bolster the district court's conclusion by arguing: (1) that the 1978 Regulations actually provided benefits to plaintiffs beyond those provided in 1976 Act and Regulations; and (2) that the Supreme Court relied on the promulgation of the 1978 Regulations when deciding that the admission procedures were adequate.
 
 
 62
 As we suggested above, our review of the 1978 Regulations indicates that they revised the 1976 Regulations in only the following substantive respect: the 1978 Regulations included a new general complaint system that allowed patients to object to their care, to have a prompt resolution of the complaint by an otherwise uninvolved decisionmaker, and to appeal that resolution. See Sec. 7100.113.4, 8 Pa.Admin.Bull. at 2443-44 (ARTICLE VII GRIEVANCE AND APPEAL PROCEDURES).[28] The new grievance and appeal procedures, however, relate only to the quality of care provided at a facility once one is properly admitted. The quality of care provided at a facility is, as we have discussed, unrelated to whether admission procedures are constitutional under the Court's analysis and not otherwise within the scope of relief requested by plaintiffs. Plaintiffs' argument that we must find that they were benefitted by the 1978 Regulations because the Supreme Court cited these regulations when discussing the reformed admissions procedures is unpersuasive. We read these citations as no more than appropriate citations to the form of the procedures currently in force in the state given the fact that the 1978 Regulations specifically superseded the 1976 Regulations. See 8 Pa.Admin.Bull. at 2432. Plaintiffs are benefitted for purposes of 42 U.S.C. Sec. 1988 only by substantive changes in procedures, not by formal changes in the codification of procedures. Thus, we conclude that the district court erred when it determined that plaintiffs received any benefits from the 1978 Regulations.
 
 
 63
 Plaintiffs also argue that they should be fully eligible for counsel fees for time spent litigating the case before the Supreme Court after the date of the promulgation of the 1978 Regulations. The Supreme Court's clear holding in Secretary of Public Welfare v. Institutionalized Juveniles, 442 U.S. 640, 99 S.Ct. 2523, 61 L.Ed.2d 142 (1979), was that the Commonwealth's procedures for the admission of juveniles as they stood at the date of the Court's decision met the due process requirements set out in Parham v. J.R., 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979). Plaintiffs had sought in their original and amended complaints a declaration that the defendants' procedures were unconstitutional and that plaintiffs be granted very specific pre-deprivation procedural rights. The Court, however, conferred no relief upon the plaintiffs' class, but instead, entering judgment for defendants, upheld the state's system of pre- and post-deprivation procedures. Thus the Court did not grant plaintiffs the relief they sought, even though it did define the nature of juveniles' due process rights regarding admission to mental health facilities in Parham.
 
 
 64
 We cannot conclude that this definition of rights, consistent as it was with defendants' then-existing admissions standards, constitutes a benefit to plaintiffs. We agree with the district court's holding that the Supreme Court's decision was simply a "gratuitous judicial endorsement of legislative and administrative action." 568 F.Supp. at 1027. This endorsement "did nothing to advance the plaintiff's claim for relief," Swietlowich v. County of Bucks, 620 F.2d 33, 34 (3d Cir.1980), and thus the Supreme Court's resolution of the case did not provide plaintiffs with any benefits they had not already received.
 
 
 65
 In sum, the plaintiffs are clearly prevailing parties under Sec. 1988. Our review of the relief requested by plaintiffs and the procedural reforms indicates that plaintiffs received substantial benefits from the 1973 Regulations, the 1976 Act, and the 1976 Regulations, but not otherwise. We therefore consider whether this litigation caused the procedural reforms.
 
 2. Causation
 
 66
 The standard in this circuit for determining whether the litigation is causally related to the relief obtained has been stated in various ways, but generally a court should decide whether the litigation "constituted a material contributing factor in bringing about the events that resulted in the obtaining of the desired relief." Sullivan v. Commonwealth of Pennsylvania Department of Labor and Industry, 663 F.2d 443, 452 (3d Cir.1981). See also Morrison v. Ayoob, 627 F.2d 669, 671 (3d Cir.1980) (per curiam) ("[t]he action need not be the sole cause. Where there is more than one cause, the plaintiff is a prevailing party if the action was a material factor in bringing about the defendant's action."), cert. denied, 449 U.S. 1102, 101 S.Ct. 898, 66 L.Ed.2d 828 (1981); Ross v. Horn, 598 F.2d 1312, 1322 (3d Cir.1979) ("If the new procedures, which provided much of the relief appellants had initially sought, were implemented as a result of this lawsuit, the appellants were prevailing parties with respect to a portion of their claims...."), cert. denied, 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980). We have also held that, in determining whether causation is shown, a district court is "bound to apply the most expansive definition...." NAACP v. Wilmington Medical Center, Inc., 689 F.2d 1161, 1169 (1982). Thus, although the litigation must have been a "catalyst for the implementation of all or any of the reform measures," Ross, 598 F.2d at 1322, it need not have been the only catalyst. See Wilmington Medical Center, 689 F.2d at 1169.
 
 
 67
 Because the district court's conclusions about causation are largely dependent on that court's experience with and assessment of the facts and history of the litigation, we review for error under the clearly erroneous standard.[29] See Silberman v. Bogle, 683 F.2d 62, 65 (1982) (citing Krasnov v. Dinan, 465 F.2d 1298, 1302 (3d Cir.1972)); see also Illinois Welfare Rights Organization v. Miller, 723 F.2d 564, 569 (7th Cir.1983) (applying clearly erroneous standard to district court's conclusion about causation). Since the defendants have conceded the finding of causation with respect to the 1973 Regulations, see Appellant's Brief at 24, we will consider only whether the litigation was a material factor in causing adoption of the 1976 Act and 1976 Regulations.
 
 
 68
 Defendants urge that the district court erred in two ways when it concluded that the litigation had caused the statutory reforms. First, they argue that the affidavits do not support the conclusion that the litigation was a material factor in the enactment of the legislation. Second, they argue that the action of the state legislature, an independent body of the Commonwealth, simply is not attributable to them. We consider these objections in turn.
 
 
 69
 The district court examined the affidavits of Ferleger; former State Senator W. Louis Coppersmith, chairman of the Senate Health and Welfare Committee, which drafted the 1976 Act; Peter Dubois, vice-president of Arthur Bollon Associates, which assisted both the Department of Public Welfare and Senator Coppersmith with the drafting of the 1976 Act; and Robert P. Hargh, Deputy Commissioner of Mental Health in the Department of Public Welfare, who served in important positions in the Department during the pendency of the litigation. Based upon these affidavits, the district court concluded that the litigation was a material factor in bringing about changes in the law. The district court relied, for example, on Sen. Coppersmith's statement that the litigation was "an important catalyst" in bringing about the changes in Pennsylvania law.[30] Sen. Coppersmith also acknowledged that Ferleger had an impact in the drafting of the legislation. We believe that portions of the record discussed by the district court support its conclusion that the litigation was an important catalyst in the enactment of the legislation and that its finding is not clearly erroneous.[31]
 
 
 70
 We are also not persuaded by defendants' argument that the law's changes in admission procedures were not attributable to them because the changes were enacted by the legislature. The rationale underlying defendants' argument, that a party should not be held accountable for benefits given to the opposing party by a third person, is not unreasonable and may, in fact, preclude recovery of attorney fees in some other context. In this case, however, the district court specifically found that defendants had been "extensively involved in the legislative process" and that defendants "actively worked with the legislature to achieve passage of the 1976 Act." 568 F.Supp. at 1030. These conclusions of the district court were based on the Haigh affidavit and are not clearly erroneous. Because the Department of Public Welfare ("DPW") became so involved in the enactment of this legislation, it seems clear that DPW must have concluded that new legislation was necessary to accomplish adequate reforms in mental health admissions procedures. When a state agency seeks to reform its procedures through the state legislature and new procedures are enacted, we agree with the district court that "passage [of the 1976 Act] is properly attributable" to defendants. Id.
 
 
 71
 We must finally consider whether the litigation was a material factor in the promulgation of the 1976 Regulations. Because the district court made no determination in this regard, we will have to remand the case to it for resolution of this question.
 
 3. Conclusion
 
 72
 We conclude that plaintiffs are prevailing parties within the meaning of Sec. 1988 because this litigation resulted in significant benefits to the plaintiffs brought about by the 1973 Regulations and the 1976 Act.[32] The district court was therefore correct in concluding that plaintiffs were eligible for some attorneys fees. This conclusion does not complete our analysis, however. In the next two sections, we consider the district court's decision to adjust the lodestar in several ways.
 
 
 73
 B. The Disallowance of Fees for Hours Expended After the Full Extent of Relief was Obtained and the Use of the Hensley Reduction Factor
 
 
 74
 We consider now two important decisions made by the district court in arriving at the final fee award. First, because the district court concluded that the final relief received by plaintiffs was granted in regulations adopted on September 2, 1978, it determined that plaintiffs were not prevailing parties for any hours devoted to the merits of the case after that date and therefore they should receive no fees for those hours. 568 F.Supp. at 1030. Second, because the relief received by plaintiffs was limited, the district court, relying on Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), reduced the lodestar amount by 50 percent.
 
 
 75
 Plaintiffs argue that these decisions were incorrect for several reasons. First, they argue that no reductions of any sort are permissible because they achieved complete success in the litigation. The short answer to this claim is that, as we have already concluded, the plaintiffs, although prevailing in the litigation, did not win complete success. See supra part III.A. Plaintiffs also contend that the district court abused its discretion by both reducing the lodestar by 50 percent and refusing to award any fees after the date that plaintiffs received the full extent of relief. The plaintiffs argue that such a "double reduction" of the lodestar is not permitted by Hensley.[33]
 
 1. The Hensley Decision
 
 76
 In order to evaluate the district court's decision we begin by assaying Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). In Hensley the Court discussed in detail how a district court might adjust the fee lodestar based on the " 'results obtained,' " a "particularly crucial [factor] where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief." Id. at 1940.[34] Because Congress has authorized only an award of "reasonable" fees, reduction of the lodestar in cases of "only partial or limited success" is necessary to ensure that a party is not liable for "excessive" attorney fees. Id. at 1941. The Court explained in language particularly germane to this case that:
 
 
 77
 Application of this principle is particularly important in complex civil rights litigation involving numerous challenges to institutional practices or conditions. This type of litigation is lengthy and demands many hours of lawyers' services. Although the plaintiff often may succeed in identifying some unlawful practices or conditions, the range of possible success is vast. That the plaintiff is a "prevailing party" therefore may say little about whether the expenditure of counsel's time was reasonable in relation to the success achieved.
 
 
 78
 Id.
 
 
 79
 In addition to describing when an adjustment to the lodestar may be necessary, the Court provided direction as to how the reduction is to be accomplished. First, the Court made it clear beyond any doubt that, when making an adjustment, "[t]he result is what matters," id., and "the most critical factor is the degree of success obtained." ID. The Court also held that the reduction is a matter of discretion for the district court to be exercised in light of specific considerations. Id.[35] The Court then established two general methods of fee reduction. The first method involves the total elimination of fees for hours that were spent litigating claims on which the party did not succeed and that were "distinct in all respects from" claims on which the party did succeed. See Id. at 1943. In effect this first method results in a reduction of the lodestar. The second method involves a more general reduction of the lodestar, i.e., of the net lodestar amount, taking into account any reduction in the initial lodestar for litigating wholly unsuccessful claims, so that the award provides "only that amount of fees that is reasonable in relation to the results obtained." Id. This reduction would typically be applied to hours spent litigating claims that were wholly or partially unsuccessful yet were related to the litigation of successful claims. In sum, the district court should focus on "what is reasonable in light of th[e] level of success." Id. at 1942.
 
 
 80
 Hensley was a case involving several fully litigated claims that met with partial judicial success. See id. at 1936. Accordingly, the two methods of relating the amount of a fee award to the results obtained that the Court outlined in Hensley have to be shaped to fit a case that involves plaintiffs who made a claim for substantial relief based on one legal theory and received regulatory and legislative reform as a result of the litigation. See Illinois Welfare Rights Organization v. Miller, 723 F.2d 564, 567 (7th Cir.1983) ("The problem with applying the analyses in Hensley to the present case is that Hensley involved fully litigated claims and not a settlement agreement."). Recognizing that the lessons of Hensley will have to be applied flexibly to be fully responsive to the different problems presented by the rather unique history of this litigation, we consider whether the whole and partial disallowances of fees by the district court were proper.
 
 
 81
 2. The District Court's Complete Disallowance of Hours
 
 
 82
 Concluding that plaintiffs were not prevailing parties in regard to hours spent after the date that plaintiffs received the final benefit from defendants, the district court denied fees in their entirety for these hours. As we suggested in part III.A., we believe that prevailing party status must be determined based on the relief received through the entire litigation.[36] It is improper to decide whether or not plaintiffs "prevailed" as to specific hours; rather, the disallowance of hours is pursued, as Hensley directs, to ensure that the final award of fees is reasonable in light of the benefits received by plaintiffs. We therefore will consider whether the district court's reduction is permissible under Hensley.
 
 
 83
 In this litigation, all the benefits received by plaintiffs were from regulatory and legislative reforms that perforce did not result directly from the order or judgment of a court. The Supreme Court heard the merits of the case twice, concluding in the first appeal that the claims of the named plaintiffs were moot, see Kremens v. Bartley, 431 U.S. 119, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977), and in the second appeal that plaintiffs' claims should be denied because the admission procedures, which had been totally reformed long before argument in the Court, fully complied with due process requirements. See Secretary of Public Welfare v. Institutionalized Juveniles, 442 U.S. 640, 99 S.Ct. 2523, 61 L.Ed.2d 142 (1979). We believe that in this context it was within the discretion of the district court, as it fashioned a reasonable fee, to disallow any fees for time spent litigating the case after the last benefit is won from the defendant, because the expenditure of such time is equivalent to expending time litigating particular claims that are unrelated to the relief ultimately obtained, for which Hensley directs a disallowance of fees. This is especially true given our conclusion that a gratuitous judicial endorsement is not relief of the type that makes one a prevailing party. Thus, the district court's adjustment of the fee in this manner was an appropriate reduction under Hensley.
 
 
 84
 Although the court's method of reduction is consistent with the teaching of Hensley, we concluded in part III.A of our discussion that the last benefit received by plaintiffs came as a result of the promulgation of the 1976 Regulations.[37] Accordingly, the amount of hours that should have been completely disallowed is much greater, given our view of the precise extent of plaintiffs' success. We will therefore remand the case to the district court with the direction that it disallow entirely all hours spent litigating this case after the date on which plaintiffs received their last benefit from defendants. The actual extent of the disallowance will, of course, depend on whether plaintiffs caused the reforms in the 1976 Regulations. See supra note 36.
 
 
 85
 3. The District Court's General Reduction of the Lodestar
 
 
 86
 The district court next reduced the remaining lodestar value by 50 percent based on the partial success of the plaintiffs. The court concluded that:
 
 
 87
 While the protections which were conferred by the statutes and regulations and upheld by the Supreme Court are significant, they are more limited than the traditional due process rights sought. The plaintiffs fell significantly short of their goal. The reduction spoken of in Hensley is peculiarly appropriate here.
 
 
 88
 568 F.Supp. at 1033.
 
 
 89
 The court's action was wholly consistent with the Supreme Court's direction in Hensley that, when determining the final fee, "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." 103 S.Ct. at 1940. The court's use of the overall reduction of the lodestar is warranted because plaintiffs' partial success in the litigation is attributable to work on the one claim against defendants. Work performed prior to the receipt of the full extent of benefits by plaintiffs is not work that can be identified as either wholly successful or wholly unsuccessful. In light of our general agreement with the district court that the plaintiffs were only partly successful in this action, we conclude that the district court did not abuse its discretion in ordering a general reduction of the lodestar.
 
 
 90
 We also are constrained to conclude, however, that the district court will have to recalculate the amount by which the adjusted lodestar should be reduced. Recalculation is necessary, first, because our discussion in part III.A.1 reflects a lack of total agreement with the district court about the precise extent of plaintiffs' success. Given that our view of the extent to which plaintiffs were benefitted by this litigation may, in fact, be significantly different from the district court's view, we cannot be certain that the amount of the general reduction actually resulted in a fee that was reasonably related to the overall relief obtained by plaintiffs. See Hensley, 103 S.Ct. at 1940.
 
 
 91
 More importantly, however, a recalculation is necessary because our holding regarding the complete disallowance of hours will result in a much lower adjusted lodestar for plaintiffs' counsel. See supra text following note 37. On remand, the district court should reconsider the amount of the overall Hensley reduction factor, because, after the disallowance of the additional hours, the benefits received by plaintiffs will have been gained through the expenditure of fewer hours, and a lower reduction may be in order. In sum, we remand the case so that the district court may reconsider its reduction of the lodestar to ensure that the fee is actually reasonable in light of the specific benefits gained by plaintiffs.
 
 C. The Use of Enhancement Multipliers
 
 92
 The district court decided to enhance the final fee award by (1) 25 percent to reflect the quality of work and contingent nature of the fee and (2) an additional 25 percent to reflect the delay in receipt of payment. Both sides appeal these adjustments. Defendants argue that neither a quality nor a contingency multiplier is appropriate to enhance the fee of a party that has not succeeded in court. They also argue that a quality multiplier is not justified in this case given the Supreme Court's decision in Blum v. Stenson, --- U.S. ----, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), which was filed after the district court's decision. Plaintiffs, however, contend that the 25 percent increase for delay in payment was too low, given the much higher combined rate of interest over the life of this litigation.[38] We will review first the 25 percent quality and contingency multiplier and then the 25 percent delay in payment multiplier.
 
 
 93
 We reject the defendants' arguments that a quality multiplier is precluded in all cases in which a party has not achieved a formal victory in court. Such a rule would be unnecessarily overbroad, preventing, as it would, the use of a quality multiplier in cases in which excellent legal work causes relief without an actual court directive and results in a moot case. Just as the form of judgment does not determine one's prevailing party status, it also should not determine eligibility for a quality multiplier when the circumstances indicate that such a multiplier is otherwise appropriate.
 
 
 94
 We are also unwilling to adopt the defendants' argument that there should be a per se rule against quality multipliers when a party has won only partial success and the district court engages in a reduction under the Hensley rule. See Ramos v. Lamm, 713 F.2d 546, 557 (10th Cir.1983) (in pre-Blum case, court concludes that a quality multiplier may be used in a case in which the plaintiff did not prevail on all issues). Fee reductions under Hensley, as we discussed in Part IV.B, ensure that the final award reflects the results obtained in litigation by requiring a district court to disallow an award for certain work, either partially or entirely, based on the extent to which the work was performed on unsuccessful claims. We believe that a district court has discretion, after this reduction is made, to consider whether the work that resulted in the partial success was of sufficient quality to warrant a multiplier.[39] Allowing a quality multiplier simply ensures that the treatment of fees in cases of complete and partial success is consistent: once the Hensley reduction is accomplished, the fee in a partial-success case is functionally equivalent to the final lodestar value in a case of complete success on the merits, and both of these fees may then be enhanced under the governing law of multipliers.
 
 
 95
 The conclusion that a Hensley reduction does not bar a quality multiplier is not the end of our analysis. We must still consider whether the Supreme Court's decision in Blum v. Stenson, --- U.S. ----, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), requires that plaintiffs' eligibility for an enhancement multiplier be redetermined. In Blum, the Court concluded that:
 
 
 96
 [The district court] may justify an upward adjustment only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was "exceptional."
 
 
 97
 Id. at 1549 (citing Hensley, 103 S.Ct. at 1940) (emphasis added). In addition to placing the burden of proving the need for a quality multiplier on the proponent, see Blum, 104 S.Ct. at 1548, and quantifying that burden, Blum specifically precludes a multiplier based on certain considerations. First, a multiplier cannot be awarded because the case was complex or the legal issues were novel; these considerations instead will have an impact on the number of hours allowed. Id. at 1548-49. Also, a multiplier is not to be routinely awarded based on the general quality of representation because this factor is considered in determining a reasonable hourly rate. See id. at 1549.
 
 
 98
 In this case, the district court awarded a quality multiplier "to compensate [Ferleger] for the quality of his work, the contingent nature of the success at the outset as well as the importance of the constitutional provisions underlying this action." 568 F.Supp. at 1033. These bases for the multiplier seem sufficiently related to the general quality of representation that it is doubtful that the quality multiplier is permissible under Blum. Because, however, the precise rationale of the district court is unclear, we remand the issue so that it may consider whether this is the sort of "rare" case in which a quality multiplier is allowed.
 
 
 99
 The district court also based the initial 25 percent multiplier on "the contingent nature of the success." Id. Although the Blum Court did not decide whether a contingency multiplier is permissible under Sec. 1988, see Blum, 104 S.Ct. at 1550 & n. 17, this court recently decided that a contingency multiplier is permissible in a Sec. 1988 case. Hall v. Borough of Roselle, 747 F.2d 838, 842-43 (3d Cir.1984). Hall does, however, provide that the party requesting such a multiplier meet the burden of proving that it is necessary. Id. at 843. Accordingly, the district court should, on remand, review the request for a contingency multiplier to ensure that plaintiffs have met the burden of proof set out in Hall.
 
 
 100
 The second enhancement multiplier was intended to compensate plaintiffs' counsel for the delay in payment. Delay in payment was first identified as a proper reason for increasing a fee award in Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp., 540 F.2d 102, 117 (3d Cir.1976) (Lindy II ), in the common fund context. See also In re: Fine Paper Antitrust Litigation, 751 F.2d 562, 588 (3d Cir.1984). The multiplier has subsequently been applied in civil rights cases. See, e.g., Copeland v. Marshall, 641 F.2d 880, 893 (D.C.Cir.1980) (en banc) (Title VII fee award). The rationale for allowing the adjustment, that "payment today for services rendered long in the past deprives the eventual recipient of the value of the use of the money in the meantime," id., applies regardless of the form of the court's judgment and whether or not the party's success was complete or partial. The decision to award a multiplier for delay in payment and the amount of such a multiplier are determinations within the discretion of the district court. See Fine Paper, at 601 (Becker, J., concurring).
 
 
 101
 Plaintiffs suggest two reasons why the district court erred when it awarded only a 25 percent multiplier to compensate them for the delay in payment of the fee. First, they argue that they had presented evidence to the district court that the combined rate of inflation in Philadelphia from 1972 to 1980 was 93.2 percent. For a number of reasons, however, this figure does not demonstrate that the district court erred.
 
 
 102
 For example, the plaintiffs presented to the district court only very primitive evidence of the costs they incurred because of the delay in payment. By relying on evidence of the combined inflation rate, plaintiffs failed to offer the district court the best indicator of their costs of receiving delayed payment of fees. Evidence of the rate of market interest and the time value of money would have been far more relevant to the district court. Also, the appropriate amount of the delay multiplier is not simply the sum total of the annual inflation rates, or the annual interest rates, for the full period of the litigation. Clearly, some hours of attorney work were expended more recently than others, so that the rate of inflation, or interest, relevant to a given amount of attorney work must vary according to how long ago the attorney actually performed the work. But even if the plaintiffs had come forward with more carefully developed evidence of the costs to plaintiffs of receiving the delayed payment for services, the district court was not required to award a delay in payment multiplier that was equal to the prevailing rate of interest. Id. Attorneys who are compensated for litigation by clients through normal billing practices do not as a rule recover the full rate of interest for late payment of fees. And, indeed, nonpayment of fees is not uncommon. To hold that the delay in payment multiplier must be equal to the prevailing rate of interest would mean that attorneys who recover fees under Sec. 1988 would be better compensated than the bar as a whole. In sum, all of the factors we have mentioned should inform the district court's exercise of discretion when awarding a delay in payment multiplier.
 
 
 103
 Plaintiffs also argue that the district court erred because the amount of the lodestar as adjusted by the delay in payment multiplier is substantially less than the value of the time expended by Ferleger if calculated according to his current, rather than historic, hourly rate. See supra note 14. The short answer to this argument is that, although plaintiffs' comparison of dollar amounts may be correct, Ferleger's current hourly rate more likely reflects his increased experience and skill as a lawyer than some change in the time value of money.[40] Thus, an unadjusted comparison between a fee based on historical rates and a fee based on current rates has little relevance when assessing a delay in payment multiplier in cases where an attorney's increased hourly rates are attributable to that individual's increased value to clients.[41]
 
 
 104
 Based on the record we review in this case and the burden on plaintiffs to document the need for a multiplier, we conclude that the district court did not abuse its discretion in awarding a 25 percent multiplier to compensate plaintiffs for the delay in payment.
 
 
 105
 In sum, we remand for redetermination of the initial 25 percent multiplier for the quality of representation and contingent nature of success and affirm the 25 percent multiplier for delay in payment.
 
 
 106
 D. The Fee Award for Preparing the Fee Petition
 
 
 107
 In determining the fee to be awarded for hours devoted to the preparation and litigation of the fee petition, the district court reduced the award by a factor of .125 because "plaintiffs have not achieved complete success on the fee petition." 568 F.Supp. at 1034. The court provided the following specific examples of the lack of success:
 
 
 108
 I have reduced some hours. I have completely disallowed hours claimed for work performed by Ms. Boyd and other law students. I have rejected the plaintiffs' argument that they won new rights as a result of the Supreme Court's second opinion in this case. Despite the lack of complete success I have not eliminated specific hours from those claims for work on the fee petition. Instead, I shall reduce the overall award for fee petition work by .125.
 
 
 109
 Id. Plaintiffs argue that this reduction is permitted by neither Prandini v. National Tea Co., 585 F.2d 47 (3d Cir.1978), which established that, in a case involving a statutory fee award, fees incurred in litigating the fee petition are compensable, nor Hensley, which provided for fee reductions based on the results obtained.
 
 
 110
 We find this argument lacking in merit. Prandini itself, for example, implies that the award of fees should be tied to results obtained, stating that compensation should be allowed "for time spent on the fee application and successful fee appeals." Prandini, 585 F.2d at 53 (emphasis added). More importantly, we believe that the fee reduction rationale of Hensley, because it is intended to ensure the award of a reasonable fee in light of the results obtained, applies by force of the Court's reasoning to fees generated in the litigation of a fee petition, and compels us to treat the fee petition litigation as a separate entity subject to lodestar and Hensley reduction analysis. See supra part III.B.1.[42]
 
 
 111
 The First Circuit, although it has not addressed the issue in these specific terms, also appears to agree with this conclusion. In Grendel's Den, Inc. v. Larkin, 749 F.2d 945 (1st Cir.1984), the court specifically disallowed fees for several hours that were spent litigating a wholly unsuccessful portion of a fee petition. The court reasoned that "granting [fees] to his fees counsel [for hours spent on the unsuccessful claims] would stand the Fees Act on its head and encourage the filing of nonmeritorious claims for fees." Id. at 958. The court also appeared to accept without comment the decision of the district court to award fees for work on the fee petition based in part on "the degree of ... success." Id. at 957. We are thus convinced, by the rationale of both Hensley and Grendel's Den, that counsel fees for litigating fee petitions should be liable to reduction by use of the methods set out in Hensley and discussed in part III.B. Cf. Danny Kresky Enterprises Corp. v. Magid, 716 F.2d 215, 219 (3d Cir.1983) (reversing district court's reduction of attorney time spent in preparing the fee petition based on the facts of the case without any suggestion that such a reduction is precluded in all cases).
 
 
 112
 We need only consider, therefore, whether the reduction ordered by the district court was appropriate. In Hensley, the Court stated that:
 
 
 113
 There is no precise rule or formula for making [lodestar reduction] determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment.
 
 
 114
 103 S.Ct. at 1941. Thus, Hensley establishes that the initial decision on the appropriate approach to the reduction of the lodestar is within the discretion of the district court. A court has discretion to decide whether it is proper to adjust the lodestar by a general reduction of the lodestar, by the complete disallowance of hours spent litigating wholly unsuccessful claims, or by use of both methods. This general approach to adjusting the fee will be reversed by this court only when there is a clear showing that the court's approach was improper given the degree of relatedness between the claims on which the party was wholly or partially successful and wholly unsuccessful claims.[43] This approach also gives the district court greater flexibility.[44]
 
 
 115
 In this case, the district court specified some of the ways in which the fee petition was unsuccessful and, as we have noted, decided that a general reduction of Newberg's fee was appropriate based on the partial success. As we indicated, plaintiffs argue that it is simply impermissible to reduce Newberg's fee, but neither party has explained why the court's approach to the fee reduction was improper. We believe that, in light of Newberg's partial success on the fee petition, the considered reduction of his fee was a proper exercise of discretion by the district court.
 
 
 116
 E. The Failure to Award Fees for Work as Guardian Ad Litem
 
 
 117
 Plaintiffs appeal the district court's decision to deny fees incurred by Ferleger in his work as guardian ad litem. The district court resolved the request in the following manner:
 
 
 118
 Mr. Ferleger has sought a separate award on account of his status as guardian ad litem. This status was conferred upon him to facilitate his communication with class members who were institutionalized and sometimes suffering from disabilities. It was also intended to promote cooperative discovery between the parties. The appointment of Mr. Ferleger as guardian was not intended to confer additional duties upon him beyond his obligations as class counsel. Assuming that an award based upon the appointment is permissible, it is not appropriate in this case.
 
 
 119
 568 F.Supp. at 1033.
 
 
 120
 This court has held that a district court may properly award to a guardian ad litem "additional compensation for services rendered on behalf of the minors ... and ... necessary expenses," when proper evidence is presented. Mutual Life Insurance Co. of New York v. Ginsburg, 228 F.2d 881, 884 (3d Cir.1956). We reaffirm that such an award is permissible but conclude that the district court acted well within its discretion when denying an award in this case, given (1) the district court's conclusion that the appointment of Ferleger as guardian did not actually confer on him any duties beyond those otherwise required as counsel for plaintiffs, and (2) plaintiffs' failure to document the extent of any additional costs in time and expenses.
 
 F. The Award of Costs
 
 121
 Plaintiffs next appeal the district court's decision not to award costs to them. The district court stated that such an award was not warranted because "[t]he limited nature of the success achieved convinces me that in this case it is appropriate for each side to bear its own costs." 568 F.Supp. at 1035.
 
 
 122
 As one treatise notes, "[i]n the typical case, costs will be allowed to the 'prevailing party' as of course under Rule 54(b)." 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure Sec. 2667, at 174 (2d ed. 1983). Given this general rule, we have held that "a district court may not deny costs to the prevailing party unless it supports that determination with an explanation." Samuel v. University of Pittsburgh, 538 F.2d 991, 999 (3d Cir.1976). In describing the limits on a district court's discretion to deny costs to a prevailing party, we have also held that " 'the denial of costs to the prevailing party ... is in the nature of a penalty for some defection on his part in the course of the litigation.' " ADM Corp. v. Speedmaster Packing Corp., 525 F.2d 662, 665 (3d Cir.1975) (quoting Chicago Sugar Co. v. American Sugar Refining Co., 176 F.2d 1, 11 (7th Cir.1949), cert. denied, 338 U.S. 948, 70 S.Ct. 486, 94 L.Ed. 584 (1950)). The Chicago Sugar case provides the following examples of a "defection" that would warrant denying costs to a prevailing party: "calling unnecessary witnesses, bringing in unnecessary issues or otherwise encumbering the record, or ... delaying in raising objection fatal to the plaintiff's case ... A party, although prevailing, would be denied costs for needlessly bringing or prolonging litigation." 176 F.2d at 11 (citations omitted). We must therefore consider whether the rationale for denying costs to plaintiffs articulated by the district court is consistent with ADM 's requirement that fees be granted to a prevailing party in the absence of some "defection."
 
 
 123
 The district court did not address in detail whether plaintiffs met the threshold "prevailing party" requirement of Fed.R.Civ.P. 54(d). We agree with the Fifth Circuit's conclusion that the test for prevailing party status under Rule 54(d) should be the same as the test for prevailing party status under 42 U.S.C. Sec. 1988 (1982). See Studiengesellschaft Kohle v. Eastman Kodak Co., 713 F.2d 128, 131-32 (5th Cir.1983). The use of the same test will appropriately simplify the litigation of disputes concerning cost and fee awards.[45] Thus plaintiffs, as prevailing parties in the litigation for fee purposes, see supra part III.A. are prevailing parties for purposes of Rule 54(d).
 
 
 124
 As set out above, the district court denied costs because of the limited nature of plaintiffs' success. 568 F.Supp. at 1035. Limited success, however, is not a "defection" under the standard articulated in ADM and described in detail in Chicago Sugar and therefore does not justify the penalty of a denial of costs. Accordingly, by applying an incorrect legal standard, the district court abused its discretion and, unless there is a showing on remand that plaintiffs needlessly prolonged or complicated the litigation, resulting in unjustifiable costs, the court must enter judgment for costs in favor of plaintiffs.
 
 G. Post-Judgment Interest
 
 125
 Finally, plaintiffs contend that the district court erred because it failed to award post-judgment interest pursuant to 28 U.S.C. Sec. 1961 (Supp.1983),[46] which provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." Given our decision to vacate the judgment of the district court and to remand for recalculation of the fee, Fed.R.App.P. 37 requires us to provide direction as to the award of post-judgment interest following remand.[47]
 
 
 126
 In Perkins v. Standard Oil Co. of California, 487 F.2d 672 (9th Cir.1973), the court of appeals considered in detail the date from which interest should be available when a district court's award of attorney fees is modified by the court of appeals. The court concluded that:
 
 
 127
 Where a single item such as attorneys' fees is reduced on appeal, the district court's determination should be viewed as correct to the extent it was permitted to stand, and interest on a judgment thus partially affirmed should be computed from the date of its initial entry.
 
 
 128
 Id. at 676. Accord R.W.T. v. Dalton, 712 F.2d 1225, 1234-35 (8th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); Copper Liquor, Inc. v. Adolph Coors Co., 701 F.2d 542, 543 (5th Cir.1983) (en banc) (per curiam). We adopt the rule set out in Perkins.[48]
 
 
 129
 Accordingly, on remand the district court should allow post-judgment interest on the amount of the recalculated award from the date of its original order allowing the award, i.e., July 26, 1983.[49]
 
 IV. CONCLUSION
 
 130
 In sum, we conclude that (1) plaintiffs are prevailing parties based on the relief they received from the 1973 Regulations, the 1976 Act, and possibly the 1976 Regulations, depending on the district court's conclusion about causation; (2) the district court's methods of reducing the lodestar were appropriate, but the specific reductions must be recalculated to comply with our conclusions about the extent of plaintiffs' success in this litigation; (3) the use of the quality and contingency multiplier will be remanded for reconsideration in light of Blum and Hall; (4) the use and amount of the multiplier to account for delay in payment will be affirmed; (5) the reduction of the fee for preparing the fee petition will be affirmed; (6) the decision not to award fees for guardian ad litem services will be affirmed; (7) the decision not to award costs to plaintiffs will be remanded for reconsideration; and (8) post-judgment interest must be awarded on the amount of the recalculated award from the date of its original order awarding the fee, except to the extent that additional fees are awarded for work on this appeal.
 
 
 131
 The judgment of the district court will therefore be affirmed in part and vacated in part, and the case will be remanded for further proceedings consistent with this opinion, each side to bear its own costs for this appeal.
 
 
 
 [1]
 Sections 402 and 403 of the 1966 Act provide in part:
 Section 402. Voluntary admission; application, examination and acceptance; duration of admission.
 (a) Application for voluntary admission to a facility for examination, treatment and care may be made by:
 (1) Any person over eighteen years of age,
 (2) A parent, guardian or individual standing in loco parentis to the person to be admitted, if such person is eighteen years of age or younger.
 (b) When an application is made, the director of the facility shall cause an examination to be made. If it is determined that the person named in the application is in need of care or observation, he may be admitted.
 (c) Except where application has been made under the provisions of Section 402(a)(2) and the person admitted is still eighteen years of age or younger, any person voluntarily admitted shall be free to withdraw at any time. Where application has been made under the provisions of Section 402(a)(2), only the applicant or his successor shall be free to withdraw the admitted person so long as the admitted person is eighteen years of age or younger.
 Section 403. Voluntary commitment; application, examination and acceptance; duration of commitment.
 (a) Application for voluntary commitment to a facility for examination, treatment and care may be made by:
 (1) Any person over eighteen years of age.
 (2) A parent, guardian or individual standing in loco parentis to the person to be admitted, if such person is eighteen years of age or younger.
 (b) The application shall be in writing, signed by the applicant in the presence of at least one witness. When an application is made, the director of the facility shall cause an examination to be made. If it is determined that the person named in the application is in need of care or observation, he shall be committed for a period not to exceed thirty days. Successive applications for continued voluntary commitment may be made for successive periods not to exceed thirty days each, so long as care or observation is necessary.
 (c) No person voluntarily committed shall be detained for more than ten days after he has given written notice to the director of his intention or desire to leave the facility, or after the applicant or his successor has given written notice of intention or desire to remove the detained person.
 
 
 [2]
 Plaintiffs did not challenge those sections of the 1966 Act relating to "involuntary" commitment to mental health facilities. See Pa.Stat.Ann. tit. 50, Secs. 4405 & 4406 (Purdon 1969). Under Sec. 405, mentally disabled persons, regardless of age, can be committed for up to 10 days in the event of an emergency. Under Sec. 406, a person may be committed for an indefinite period if the court of common pleas is petitioned and the person is provided a hearing with many procedural safeguards
 
 
 [3]
 28 U.S.C. Sec. 2281 (1970) provided that any application for an interlocutory or permanent injunction restraining a state from enforcing a state statute be heard and determined before a three-judge district court. It was repealed by Pub.L. No. 94-381, 90 Stat. 1119 (1976). A single district judge has heard the case since July 1980
 
 
 [4]
 The 1973 Regulations provide:
 
 
 [1]
 All juveniles aged 18 and younger to be admitted to an institution must be referred from a recognized medical facility, Mental Health/Mental Retardation therapist or Mental Health Agency; however, mentally retarded juveniles may be referred by either a pediatrician, or general physician or psychologist;
 
 
 [2]
 This referral must be accomplished by a psychiatric evaluation and that report must indicate with specificity the reasons that the person requires institutional care, however, a medical or psychological evaluation may accompany the referral of a mentally retarded juvenile;
 
 
 [3]
 The Director of the Institution or his delegate, shall have conducted an independent examination of the proposed juvenile, and if his results disagree with the professional's opinion, the Director, or his delegate shall discharge the juvenile;
 
 
 [4]
 The telephone number and address of the juvenile's parents or the person who is requesting admission for the juvenile must accompany the referral;
 
 
 [5]
 Within 24 hours after the juvenile's admission, every youth who is at least 13 years of age must receive written notification (which he signs) explaining his rights indicating that he will be given a status report periodically of his condition; that he can contact by telephone or by mail his parents or the person who requested his admission; and that he will be furnished with the number of counsel (Public Defender's number; Legal Services) that he can call for representation. An appropriate person shall explain this notice ...;
 
 
 [6]
 In the event that a juvenile whose chronological age is 13 or older objects (either orally or in writing) to remaining in the Institution, the Director, or his delegate, if he feels it is necessary for the youth to remain may continue the institutionalization for two business days during which time he shall notify the applicant and the referral unit so that either party may institute a 406 proceeding. During the same two-day period, the Director, or his delegate, shall notify the Public Defender's Office or notify Legal Services readily available of the juvenile's need for legal representation. If a 406 proceeding is begun during the two-day period, the juvenile shall remain institutionalized. If the applicant cannot be located and the Director, or his delegate, feels that the juvenile does not require institutionalization, the Director or his delegate, shall direct the Base Service Unit to assume responsibility of providing for the juvenile's aftercare. However, if the Director, or his delegate, feels that the juvenile requires institutionalization, he shall direct the Base Service Unit to file a 406 proceeding within two days after failure to locate the applicant;
 
 
 [7]
 The juvenile's counsel shall be furnished with the juvenile's evaluation from the referral unit, with a psychiatric evaluation from the Institution, and with a written report of the reasons to institutionalize the juvenile;
 
 
 [8]
 If the staff member of the facility giving notice to the patient determines that the patient is incapable of understanding the notification, it shall be written on the notification
 
 
 [5]
 The 1966 Act defined "mental retardation" as:
 subaverage general intellectual functioning which originates during the developmental period and is associated with impairment of one or more of the following: (1) maturation, (2) learning, and (3) social adjustment.
 Pa.Stat.Ann. tit. 50, Sec. 4102 (Purdon 1969).
 
 
 [6]
 Section 203 of the 1976 Act provides as follows:
 Before a person is accepted for voluntary inpatient treatment, an explanation shall be made to him of such treatment, including the types of treatment in which he may be involved, and any restraints or restrictions to which he may be subject, together with a statement of his rights under this act. Consent shall be given in writing upon a form adopted by the department. The consent shall include the following representations: That the person understands his treatment will involve inpatient status; that he is willing to be admitted to a designated facility for the purpose of such examination and treatment; and that he consents to such admission voluntarily, without coercion or duress; and, if applicable, that he has voluntarily agreed to remain in treatment for a specified period of no longer than 72 hours after having given written notice of his intent to withdraw from treatment. The consent shall be part of the person's record.
 Pa.Stat.Ann. tit. 50, Sec. 7203 (Purdon Supp.1984). See also id. Sec. 7201.
 
 
 [7]
 Section 204 of the 1976 Act provides as follows:
 Upon the acceptance of an application for examination and treatment by a minor 14 years or over but less than 18 years of age, the director of the facility shall promptly notify the minor's parents, guardian, or person standing in loco parentis, and shall inform them of the right to be heard upon the filing of an objection. Whenever such objection is filed, a hearing shall be held within 72 hours by a judge or mental health review officer, who shall determine whether or not the voluntary treatment is in the best interest of the minor.
 Id. Sec. 7204.
 
 
 [8]
 These regulations define generally the extent of the individualized treatment plan. 6 Pa.Admin.Bull. at 2117, Sec. 7100.1.6; the confidentiality of certain communications, id. Sec. 7100.1.7; and the procedures for voluntary admission and treatment of adults and juveniles. See id. at 2120, Sec. 7101.2
 
 
 [9]
 The Court did not discuss the effect upon the class of the 1976 Regulations
 
 
 [10]
 These subclasses were necessary because the statutory and regulatory reforms, as we have discussed, established different procedures for the two groups of individuals. Mentally ill juveniles aged 14 or older were, of course, treated as adults under the 1976 Act
 
 
 [11]
 The court did not explicitly discuss the impact of the 1976 Regulations. See Institutionalized Juveniles, 459 F.Supp. at 36, 45-47; but cf. id. at 52 (Broderick, J., dissenting) ("The 1976 Act and its accompanying regulations, including the Bill of Rights ..., provide sufficient due process protections to a mentally or emotionally ill juvenile under the age of fourteen.")
 
 
 [12]
 These regulations superseded the 1976 Regulations. See 8 Pa.Admin.Bull. at 2432
 
 
 [13]
 The 1978 Regulations provided, in relevant part, that:
 (a) Any patient, or those helping him or her, may initiate a complaint, orally or in writing, concerning the exercise of these rights or the quality of services and treatment at the facility. The complaints shall be presented as soon as possible to the treatment team leader or other appropriate person.
 (b) Every patient shall have the right to the assistance of an independent person and witnesses in presenting his or her complaint.
 (c) The treatment team leader, administrative supervisor or their designees receiving the complaint shall investigate the complaint and make every effort to resolve it. Based upon this investigation, a decision shall be rendered in writing as soon as possible but within 48 hours after the filing of the complaint. Complaints shall be decided by persons not directly involved in the circumstances leading to the grievance.
 (d) The patient shall be given a copy of the complaint and final decision and a copy shall be filed in the patient's record.
 Id. at 2443
 
 
 [14]
 Plaintiffs suggested, however, that Ferleger should be compensated for all hours at his current rates to compensate for the delay in payment. Based upon current rates, Ferleger's lodestar request was $137,660
 
 
 [15]
 Mr. Newberg stated at oral argument that he plans to submit a supplemental affidavit in support of an award of additional fees to reflect his work on the appeal of the fee petition to this court
 
 
 [16]
 The court did not explicitly consider the 1976 Regulations, presumably because they were superseded by those issued in 1978
 
 
 [17]
 The court's specific findings were as follows:
 Date Hours x Rate = Subtotal
Merits 1972-1974 493.2 $50.00 $24,660.00
 1975 22.0 55.00 1,210.00
 1976 336.0 65.00 21,840.00
 1977 51.3 70.00 3,591.00
 1978 270.7 80.00 21,656.00
 ----------
 $72,957.00
Fee 1976 .2 65.00 $ 13.00
Petition 1977 .1 70.00 7.00
 1980 13.3 95.00 1,263.50
 1981 8.0 105.00 840.00
 ----------
 $ 2,123.50
 TOTAL
 LODESTAR: $75,080.50
 
 
 [18]
 The district court's decision in this regard was not appealed
 
 
 [19]
 The court's specific findings were as follows:
 Date Hours x Rate = Subtotal
9/75-8/78 15.5 $135.00 $ 2,092.50
9/78-8/80 3.0 150.00 450.00
9/80 to date 70.2 175.00 12,337.50
 ----------
 TOTAL
 LODESTAR: $14,880.00
 
 
 [20]
 The overall effect of the two multipliers and one reduction was to leave Ferleger's award at $75,080.50
 
 
 [21]
 Before considering the contentions of the parties, we note the contours of our scope of review of the district court's award of fees in matters of this kind. In Silberman v. Bogle, 683 F.2d 62 (3d Cir.1982), we stated that:
 an award of reasonable attorneys' fees is within the district court's discretion.... Thus our standard of review is a narrow one. We can find an abuse of discretion if no reasonable man would adopt the district court's view.... We may also find an abuse of discretion when the trial court uses improper standards or procedures in determining fees, or if it does not properly identify the criteria used for such determination. Factual findings, of course, are subject to the clearly erroneous standard of review....
 Id. at 64-65 (citations omitted).
 
 
 [22]
 Defendants also object to the district court's decision to resolve the petition for fees based only on affidavits and oral argument. In United States v. 2,116 Boxes of Boned Beef, Weighing Approximately 154,121 Pounds, 726 F.2d 1481, 1489 (10th Cir.1984), the court held that the failure to hold a hearing and to accept proffered evidence did not warrant reversal of an award of fees under the Equal Access to Justice Act ("EAJA") given that "[t]he trial court gave the parties ample opportunity to brief and to argue the EAJA issue, including an opportunity to submit pertinent affidavits, and rendered its decision based upon careful consideration of all arguments before the court." These factors are also present in this case and support our conclusion that the form of the proceeding in district court was sufficient to consider all issues concerning the fee and to make an award
 
 
 [23]
 Our discussion of the modification of the lodestar pursuant to Hensley is included in part III.B
 
 
 [24]
 It is clear that the Wilmington Medical Center panel, in relying solely on the "some of the benefit" language of Nadeau, did not resolve an apparent tension in the Nadeau standard between success on "any significant issue" and achieving "some of the benefit" sought. Notwithstanding this possible difference in tone between the two standards, we believe that Wilmington Medical Center is similar enough to Nadeau to survive the Court's discussion in Hensley
 
 
 [25]
 The Hensley Court, in fact, specifically suggests that a party can be eligible for attorneys' fees, albeit at a reduced amount, even though that party "had lost on the major issue" of the litigation and had obtained only "minor relief." Hensley, 103 S.Ct. at 1942 n. 14. This suggestion is included in a footnote that disapproves an Eighth Circuit opinion because of the amount of fees awarded but otherwise implies that the party was eligible for an appropriate amount of fees. See id
 
 
 [26]
 As we mentioned above, see supra text accompanying note 23, the discussion about the precise extent of benefits received by plaintiffs is necessary in light of the Court's decision in Hensley
 
 
 [27]
 The Court refers, for example, to the requirements that a juvenile be referred to a facility by a sufficient physician's referral (see Secs. 1 & 2, 3 Pa.Admin.Bull. 1840 (1973)), that the institution director must make an independent evaluation of the need for care (see id. Sec. 3), and that children older than 13 may object to their continued care (see id. Sec. 6). See 442 U.S. at 648, 99 S.Ct. at 2527
 
 
 [28]
 The plaintiffs do not mention this provision as granting them an additional benefit. They instead direct us to several other procedures outlined in the 1978 Regulations, but the procedures identified by plaintiffs had already been established by earlier reforms
 
 
 [29]
 The district court was intimately familiar with the entire course of the litigation and made its decision after conducting a hearing at which it heard oral arguments from both sides and received affidavits. Although no testimony was taken, the form of the hearing was sufficient to enable the parties to present their versions of the underlying facts and applicable law of causation. See supra note 22
 
 
 [30]
 We reject defendant's contention that Sen. Coppersmith's affidavit should not be given great weight because he is not competent to assess the motives of the members of the Pennsylvania legislature and the Governor in approving the 1976 Act. Assuming this is true, we simply note that motive is not the issue here. Neither the district court nor this court is concerned with the exact reasons why a legislator voted a particular way. Rather, we must examine if the litigation was a material factor in the formulation of legislation. Clearly, because of his position as Chairman of the Senate Health and Welfare Committee, Mr. Coppersmith was in an excellent position to judge the extent to which this litigation affected the content of the 1976 Act
 
 
 [31]
 The district court partially--and apparently inadvertantly--based its causation findings upon a portion of the affidavit of Paul Friedman, Director of the Mental Health Law Project and a recognized authority on legal rights of the mentally ill, which had been excluded from the record by stipulation of the parties. However, because the district court also based its conclusions upon other affidavits which, considered alone, amply support the court's finding of fact, the district court's error in discussing the excluded portion of the Friedman affidavit is harmless
 
 
 [32]
 Whether plaintiffs also prevailed as a result of the benefits extended by the 1976 Regulations will depend on the district court's conclusion as to whether the litigation caused those regulatory reforms
 
 
 [33]
 Plaintiffs also contend that, because they were "legally obligated" to defend the action in the Supreme Court, they should receive attorney fees for all work related to work before the Court. We find no merit in this contention, noting first that following enactment of the 1976 Act or promulgation of the 1976 Regulations plaintiffs might have offered to settle their claim based on the revised admissions procedures, but apparently did not. Even if such a settlement would have been impossible, the overarching teaching of Hensley, as we discuss in text, is that the fee is to be awarded based on the results obtained. Under Hensley, a party is clearly not entitled to a full award of requested attorney fees merely because it felt obligated to litigate an appeal of a district court decision when that favorable decision is ultimately reversed
 
 
 [34]
 Hensley posits that the district court will first calculate a lodestar amount. This obligates the district court to eliminate hours not "reasonably expended," including hours that are "excessive redundant, or otherwise unnecessary." 103 S.Ct. at 1939-40
 
 
 [35]
 See also infra part III.D (concluding that the initial decision on a proper approach to the fee reduction is within the discretion of the district court)
 
 
 [36]
 Our holding in this regard is limited to cases which have been litigated to a final judgment prior to the consideration of the application for fees. Our result might very well be different, for example, if we were considering an award of fees in a case that involved the ongoing enforcement of a structural (institutional reform) injunction, when enforcement, after final judgment, may come in discrete stages. See, e.g., Chayes, The Role of the Judge in Public Law Litigation, 89 Harv.L.Rev. 1281, 1284 (1976) (in "public law litigation," "the trial judge has increasingly become the creator and manager of complex forms of ongoing relief"). In this latter type of case, it may very well be proper for a district court to determine eligibility for attorney fees according to whether a party prevailed in a specific aspect of the proceedings. If there is such a clear and natural point (or points) of demarcation in the litigation, the district court will be justified if it concludes that it is best able to award a reasonable fee by treating different separable portions of the litigation as separate cases for purposes of eligibility for and adjustment of the fee
 
 
 [37]
 Moreover, as we pointed out in part III.A.2, the district court must still determine whether the litigation caused the reforms in the 1976 Regulations. If no causation is shown, then the 1976 Act would have provided the final relief caused by plaintiffs
 
 
 [38]
 Plaintiffs state in this regard that the sum of the annual inflation rates for the years 1972 to 1980 totals 92 percent
 
 
 [39]
 In the succeeding paragraphs, we discuss the impact of Blum v. Stenson, --- U.S. ----, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) on the award of quality multipliers and the very substantial showing that Blum requires before a quality multiplier is permissible
 
 
 [40]
 This litigation commenced in 1972, the same year that Ferleger graduated from law school. Ferleger's work in this case, therefore, was performed as he was developing his skills as an attorney
 
 
 [41]
 The District of Columbia Circuit recently concluded that:
 The current market rates of the relevant legal community may approximate the value today of the historic rates charged at the time when the legal services actually were rendered. Using current market rates to calculate the lodestar figure may counterbalance the delay in payment as well as simplify the task of the district court.
 Murray v. Weinberger, 741 F.2d 1423, 1433 (D.C.Cir.1984) (emphasis added). See also Copeland, 641 F.2d at 893 n. 23 (delay in payment multiplier not appropriate when the lodestar is calculated by using present hourly rates). By tying the calculation to market rates, the Murray court avoids the problems presented when the current hourly rate of an individual is attributable for the most part to changes in the individual attorney's skills. We question, however, the method of compensating delay in payment suggested by Murray because changes in the hourly market rate will likely be more closely correlated to the rate of inflation than to the market rate of interest. The Murray calculation may tend to underestimate the cost of the delay in payment, as a general matter. Nevertheless, because the calculation suggested in Murray is both straightforward and easily reviewed on appeal, it may very well be a sound method of adjusting a fee for the costs of delay in payment in a proper case with an adequate record.
 
 
 [42]
 As Justice Powell observed in Hensley, 103 S.Ct. at 1941, "a request for attorneys fees should not result" in a second major litigation. Justice Powell followed this observation by pointing to the possibilities of settlement of fee claims and the wide discretion vested in the district court. However, he did not explain how the district courts can avoid applying Hensley analysis to fee petition litigation. Indeed, inability to apply Hensley would deprive the district court of the means to deal with unmeritorious counsel fee claims. Fee petition litigation, we add, is not necessarily a minor matter, but can involve large sums. See, e.g., In re Fine Paper Antitrust Litigation, supra
 
 
 [43]
 Once the district court chooses its approach to the fee reduction, its application of the methods of fee reduction must be consistent with the requirements of Hensley. See supra part III.B
 
 
 [44]
 Thus, if the district court is able, based on the contents of the fee petition, to determine the time expended in litigating wholly unsuccessful claims, those hours should be eliminated in adjusting the lodestar. For example, in this case the district court might have been able to separate out the request for payment for time spent by law students--an issue that involved discrete briefing. On the other hand, such segregation of time, by issue, can be very difficult, and the district court has wide discretion in determining whether to do so. Since Hensley does not debar recovery by a prevailing party because of lack of complete success but requires that the court ensure the award of a reasonable fee in light of the results obtained, the district court may do what the district court did here, i.e., make a percentage reduction for lack of complete success
 
 
 [45]
 We are also persuaded in part by the Eastman Kodak court's argument that the use of the same prevailing party standard is supported by Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 1939 n. 7, 76 L.Ed.2d 40. See 713 F.2d at 131. It is important to note, however, that the Court in Hensley states only that the prevailing party standard is "generally applicable" where Congress has "authorized an award of fees to a 'prevailing party,' " 103 S.Ct. at 1939 n. 7 (emphasis added). The Court did not specifically discuss the award of costs
 
 
 [46]
 This provision became effective on Oct. 1, 1982, prior to the date of the order awarding attorney fees in this case. See Pub.L. No. 97-164, Sec. 2(m) (1982)
 
 
 [47]
 Fed.R.App.P. 37 provides, in pertinent part: "If a judgment is modified or reversed with a direction that a judgment for money be entered in the district court, the mandate shall contain instructions with respect to allowance of interest."
 
 
 [48]
 We therefore reject the rule articulated in Harris v. Chicago Great Western Ry., 197 F.2d 829, 835 (7th Cir.1952), which would allow interest only from the date of the revised judgment
 
 
 [49]
 We mention two other points with respect to interest. First, the amount of interest should be determined pursuant to the amended statutory provision, which was effective on the date of the original fee award. Cf. Dalton, 712 F.2d at 1235 (applying amended statutory interest amount to an award of fees originally entered prior to the effective date of the amendment)
 Second, in the event that the district court awards fees for Newberg's litigation of this appeal, interest should be allowed only from the date of that new order. See Perkins, 487 F.2d at 676.