Robert J. SWAN, Jr., by his next friend Matilda Carello, Matilda Carello on her own behalf, and Ralph P. Carello, Jr., Plaintiffs,

v.

Aubrey DANIELS, ARA Health Services, Inc., a corporation of the State of Delaware, Antonio C. Sacre, M.D., George Martino, William L. Hoosier, Bradley Lee, and Annette M. Newman, Defendants.

Civil Action No. 94–221–RRM.

United States District Court, D. Delaware.

Dec. 26, 1995.

Douglas A. Shachtman, Douglas A. Shachtman & Associates, Wilmington, Delaware, for plaintiffs.

William W. Erhart, Wilmington, Delaware, for defendant Aubrey Daniels.

Michael I. Silverman, Tybout, Redfearn & Pell, Wilmington, Delaware, for defendant ARA Health Services.

Warren B. Burt and Michael F. Duggan, Warren B. Burt & Associates, Wilmington, Delaware, for defendant Antonio C. Sacre.

Gregg E. Wilson and J. Brendan O'Neil, Delaware Department of Justice, Wilmington, Delaware, for defendants George Martino, Bradley Lee, and William L. Hoosier.

Christopher J. Curtin, Sawyer & Akin, P.A., Wilmington, Delaware, for defendant Annette M. Newman.

## OPINION

McKELVIE, District Judge.

This is a civil rights case. In a complaint filed on April 29, 1994, and amended on June 3, 1994, plaintiff Robert Swan, through his mother and stepfather, asserted claims against fourteen defendants for damages suffered as a result of Swan's attempted suicide in June of 1992 while incarcerated at the Multi–Purpose Criminal Justice Facility ("Gander Hill") located in Wilmington, Delaware.

In February of 1995, plaintiffs entered into an agreement with one of the defendants, Antonio C. Sacre, M.D., a psychiatrist, whereby Sacre paid them $40,000 in exchange for a general release of all claims arising out of the services he had provided Swan. After implementing that agreement, plaintiffs filed a motion as a "prevailing party" under 42 U.S.C. § 1988 for an award of $140,944.14 in attorney fees and out-of-pocket expenses from Sacre. Docket Item ("D.I.") 167. Plaintiffs later filed an amended motion. D.I. 171. Since they filed that motion, the court has granted a summary judgment in favor of all the remaining defendants on plaintiffs' claims under 42 U.S.C. § 1983. *Swan v. Daniels*, C.A. No. 94–221–RRM (D.Del. June 28, 1995).

The parties have completed briefing on the motion and on July 12 and 27, 1995, they presented evidence and further argument on the issues raised by the motion. This is the court's decision on plaintiffs' motion.

## I. *FACTUAL AND PROCEDURAL HISTORY*

On June 3, 1992, Robert Swan tried to kill himself while being held in the Gander Hill prison infirmary. The facts surrounding Swan's attempted suicide and the injuries he sustained are set out in detail in the court's June 28, 1995 Opinion. On April 29, 1994, plaintiffs filed a four-count complaint, asserting violations of the Eighth and Fourteenth Amendments, medical negligence, and intentional infliction of emotional distress. On June 23, 1994, this court granted plaintiffs' Revised Motion For Leave To Amend Complaint, and plaintiffs filed an amended complaint. Plaintiffs' complaint named fourteen defendants, including the following persons: the Deputy Warden of Gander Hill; various correctional officers employed at the prison; ARA Health Services, Inc. ("ARA"), a corporation that had contracted with the Delaware Department of Corrections ("DOC") under the name Correctional Medical Services ("CMS") to provide medical and mental health services to prisoners at Gander Hill; Kevin Free, the Director of Mental Health for CMS; and Dr. Antonio Sacre, a psychiatrist who had contracted with CMS to treat prisoners at Gander Hill who manifested symptoms of mental illness. In Count III of that amended complaint, plaintiffs sought damages against Sacre based on alleged medical negligence, contending he "failed to exercise the ordinary care, skill and ability with regard to Swan by failing to place him in the appropriate protective setting and by failing to establish measures that would have protected him."

On July 7, 1994, following a conference with counsel, the court issued an Order that, among other things, scheduled a status conference for October 18, 1994, provided for completion of discovery by March 14, 1995, and scheduled the case for a trial beginning on June 12, 1995. D.I. 39.

Under Delaware law, in order to establish liability for medical malpractice, a plaintiff must present the testimony of a medical expert as to the applicable standard of care and the causation of the plaintiff's injury by a defendant's negligence. 18 *Del.C.* § 6853. Prior to the October 18, 1994 status conference, defendants' counsel wrote to the court to report that plaintiffs had failed to respond to interrogatories requesting the identification of experts. Defendants' counsel asked the court to enter a supplemental scheduling order setting dates by which plaintiffs must identify experts expected to testify at the trial and their opinions. At the October status conference, the court reviewed this issue with counsel and set a schedule for disclosure of information on expert wit-

295

nesses, including a deadline of December 15, 1994, for plaintiffs to identify the experts on whom they intended to rely to establish liability. The court scheduled a further status conference for January 18, 1995.

On November 30, 1994, plaintiffs filed a motion to extend the deadlines for delivery of expert reports an additional seven weeks and to extend the time for completion of discovery to April 7, 1995. Defendants opposed plaintiffs' motion. During a December 13, 1994 telephone conference with counsel, the court agreed to reschedule the trial to July 24, 1995, and counsel agreed on a revised schedule for discovery that required plaintiffs to identify their liability experts by January 20, 1995.

On December 16, 1994, plaintiffs' counsel wrote to Sacre's attorney and suggested plaintiffs would settle their claims against Sacre for $100,000. Sacre's counsel countered with an offer of $40,000, which the plaintiffs accepted. On February 3, 1995, plaintiffs' counsel reported to the remaining defendants that plaintiffs had reached a settlement agreement with Sacre and that, as a result, plaintiffs would not be identifying an expert to testify as to Sacre's liability.

On February 6, 1995, plaintiffs signed and delivered the attached Joint Tortfeasor Release agreement to Sacre's counsel. The document was incorrectly dated January 6, 1995. Among other things, Paragraph 1 of the agreement provides that in consideration for a payment of $40,000, plaintiffs release Sacre from

> any and all demands whatsoever, whether known or unknown, in law or equity, by reason of any cause, matter or thing whatsoever, from the beginning of time to the date of these presents; and without limiting the generality of the foregoing, of and from all claims which we asserted, might have asserted or might assert for injuries, damages and/or other losses to us and/or ROBERT J. SWAN, JR. ...; it being the intention to release Dr. Sacre from all liability aforementioned, including any and all liability for unforeseen, unanticipated, unmanifested, unsuspected and/or feared

injuries, claims and demands arising out of [Sacre's medical] treatment.

Paragraph 6 further states, in part:

> We hereby certify that we have made this compromise settlement and executed this Release with the understanding that we are giving up, waiving and/or releasing every right, claim, and cause of action which we now have, or ever had or may ever have against the party herein released by reason of the said treatment described above.

Plaintiffs filed for approval of the settlement agreement in the Delaware Chancery Court on February 17, 1995. Payment was made in full to plaintiffs on February 20, 1995. The parties filed a stipulation of dismissal with this court on February 23, 1995.

On March 16, 1995, plaintiffs filed a motion with this court to enter an order directing Sacre to pay essentially all of the fees and costs plaintiffs had incurred in the case up through January 25, 1995, in addition to fees and costs incurred after that date researching, preparing, and executing the settlement agreement and litigating the fee petition. The affidavit accompanying the fee petition states that lead counsel spent 346.4 hours on this matter, associate counsel spent 7.6 hours, a law clerk spent 99.9 hours, and a legal assistant spent 87.9 hours. At prevailing hourly rates, plaintiffs sought $97,827 in fees. They also sought $18,300.62 in out-of-pocket expenses. Plaintiffs then asked the court to increase the combined amount of fees and expenses by 20% based on the contingent nature of the case. Finally, they sought $1,591 in fees and costs associated with litigating the fee petition. In total, plaintiffs requested $140,944.14 in attorney fees and expenses.

On April 4, 1995, Sacre filed an answer objecting to plaintiffs' petition for attorney fees. He argued that the "all claims" language of the settlement agreement barred plaintiffs from seeking attorney fees. In the alternative, he argued that plaintiffs' request was deficient in a number of respects. First, he asserted that many of plaintiffs' counsel's time records provided insufficient detail from which the court could determine reasonable compensation. Second, he argued that the

hourly rates asserted by plaintiffs were too high. Third, he asserted that he should not be responsible for the entire amount of plaintiffs' attorney fees. Rather, he suggested that plaintiffs' recovery should be reduced based on some apportionment among the various defendants. Fourth, he argued that plaintiffs had provided insufficient support for an increase in fees based on the contingent nature of the case.

In the June 28, 1995 Opinion, this court granted a summary judgment in favor of all remaining defendants on plaintiffs' § 1983 claims. D.I. 287.

On July 12, 1995, the court heard argument and took testimony regarding plaintiffs' petition for attorney fees. Sacre's counsel offered the following description of the settlement negotiations with regard to the issue of attorney fees:

Q: Can you tell the Court your understanding of those settlement negotiations with regard to the fee claim?

A: Well, there were no separate settlement negotiations with regard to the fee claim. There were negotiations with respect to overall settlement of the case, in that I got a letter originally from Mr. Shachtman, and I believe you have a copy there, which I can't quote exactly, but the very end of it said, in essence, that the plaintiffs[ ] demand a hundred thousand dollars in settlement of this matter, or some such words as that.

After some telephone calls with Mr. Shachtman, with my client—and I can't reconstruct those specifically—I offered $40,000, in my mind to settle all claims in the case, and thereafter received some kind of a confirmation from Mr. Shachtman that that was accepted.

Q: At any time was a term regarding fees specifically added or excluded from the final agreement?

A: No.

Q: Were you ever informed that it was plaintiffs' contention that the fees were excluded from the agreement?

A: No.

Q: Were you aware that fees were pled in the pleadings?

A: Yes.

Q: And that Section 1988 is in fact mentioned in the pleadings?

A: Yes. My thought was that we were settling all claims brought in the case for the $40,000 amount, and that was not even broken up between the state claims and the federal claims. There was no discussion of whether any, in our minds, any of it related to the federal claims or the [s]tate claims or that it was divided. It was just a total package for a settlement of the total case.

July 12, 1995 Hearing Transcript at 19–20 (D.I. 290).

At the July 12, 1995 hearing, the court indicated that it required a more specific description of the work done to facilitate the determination of a reasonable fee award. *See, e.g., Steiner v. Hercules, Inc.,* 835 F.Supp. 771, 786 (D.Del.1993) (stating that parties seeking attorney fees must identify with "sufficient particularity" the time spent and the nature of the work done). Thus, the parties agreed to schedule a second hearing on plaintiffs' petition for attorney fees.

On July 27, 1995, the court again heard argument and took testimony regarding plaintiffs' petition for attorney fees. Plaintiffs' counsel testified that prior to the settlement negotiations, he felt that plaintiffs had a "weak" case. He had consulted with five psychiatrists who could have been potential expert witnesses against Sacre. Two declined to get involved. Two agreed to testify but would not be able to offer testimony that would establish liability. The fifth apparently ended up working for Sacre. Concerning the monetary value of the case at that point, plaintiffs' counsel gave the following testimony:

Q: In light of your lack of experts, how did you value your case? What was the value, the dollar value you attached to the claim against Dr. Sacre?

A: The dollar value would have been zero because the reports I would have produced from the experts would have been valueless towards continuing the case against Dr. Sacre.

And of course, under the medical malpractice rule, you have to have an expert, with a claim against a physician. And we felt, as a practical matter, under a Section 1983 [suit], going forward against a doctor without another psychiatrist to testify against him would have been worthless.

July 27, 1995 Hearing Transcript at 30 (D.I. 299).

At the July 27, 1995 hearing, plaintiffs submitted, among other things, a revised record of work performed and a report on costs with copies of receipts. Plaintiffs' counsel's records show that lead counsel Shachtman spent 340.3 hours litigating this case, associate counsel spent 6.6 hours, a law clerk spent 99.8 hours, and a legal assistant spent 87.8 hours. Plaintiffs assert that reasonable billing rates for the community are $215 per hour for lead counsel, $200 for associate counsel, $105 for law clerks, and $85 for legal assistants. Thus, taking plaintiffs' revisions into account, plaintiffs seek a total of $92,426.50 in attorney fees and $17,679.91 in costs for litigating the merits of the case against Sacre. In addition, Shachtman spent 44.3 hours litigating the fee petition and a legal assistant spent 8.5 hours. Therefore, at plaintiffs' rates, they seek an additional $10,247 in fees for litigating the fee petition.

In submitting these records, plaintiffs' counsel maintained he had attempted to delete entries that did not relate to litigation against Sacre. However, he renewed his request that the court order Sacre to pay essentially all of the fees and costs plaintiffs had incurred in the case until the settlement:

And perhaps I feel that the theme might be illustrated if we hypothesize for a moment there was only one defendant in the case, and that was Dr. Sacre, and said to successfully bring an action against Dr. Sacre, what legal principles do I need to know, what facts do I need to know, and then applying those legal principles against those facts.

Now, what I come up with is while the law of deliberate indifference helped prepare the case against all the defendants, I could not have gone forward against Dr. Sacre without having a thorough familiarization with those principles.

In terms of the facts, for me to pursue an action against Dr. Sacre, I had to be able to try to pigeonhole him into exactly the role which a judge or a jury would accept as to what his role was, which meant that I had to find out who all the other actors were and what they were doing to separate out responsibility.

So therefore, all the facts that were necessary to prepare the factual circumstances, all the time that was necessary to research the law which was in common, I've included, and I feel the list of cases is appropriate.

July 27, 1995 Hearing Transcript at 59-60 (D.I. 299). Plaintiffs' counsel declined the court's request to make some judgment on what portion of the time, fees, or costs would be attributable to work done in connection with the claims against Sacre.

## II. DISCUSSION

### A. Are Plaintiffs Entitled to Attorney Fees?

■ As a threshold matter, this court must determine whether plaintiffs are entitled to attorney fees. 42 U.S.C. § 1988 gives a district court discretion in civil rights cases to award attorney fees to a prevailing party. A plaintiff is a "prevailing party" if it "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). The fact that a plaintiff prevailed through settlement "does not extinguish or attenuate" the claim for attorney fees. *Ashley v. Atlantic Richfield Co.*, 794 F.2d 128, 132 (3d Cir.1986).

■ Sacre argues that plaintiffs' claim for attorney fees is barred by the "all claims" language in the Joint Tortfeasor Release executed between the parties. Specifically, in Paragraph 1 of the agreement, plaintiffs agreed to release Sacre from "all claims which we asserted, might have asserted or might assert." In addition, Paragraph 6 states that plaintiffs are "giving up, waiving, and/or releasing every right, claim, and cause of action which we now have, or ever had or ever have" against Sacre. Sacre further ar-

gues that he relied on the general assumption of settling tort and medical malpractice claims that all aspects of the claim are fully negotiated and that "an attorney is expected to obtain his fee solely from the settlement monies, unless notice is otherwise given."

Plaintiffs argue they are entitled to attorney fees under the Third Circuit's decision in *Ashley*. In that case, the plaintiff entered into an agreement with the defendant to settle plaintiff's claims under his § 1983 suit. During the negotiations, plaintiff objected to a provision in the settlement agreement releasing the defendant from attorney fees under § 1988. The defendant removed the provision. Subsequent to the settlement, the plaintiff filed a motion for attorney fees, and the defendant objected. The court held that a plaintiff who settles a civil rights claim is presumed to "have retained her statutory right to an award to reasonable attorney's fees." *Id.* at 139. Therefore, if a defendant wishes to settle his total liability on a civil rights claim, "it is incumbent upon the defendant to secure an express waiver of attorney's fees. Silence will not suffice." *Id.*

Although *Ashley* is arguably distinguishable from the present case because the issue of attorney fees was not mentioned during the settlement negotiations between the parties, the broad language used by the court suggests that this fact is not relevant. *Ashley* appears to require a specific waiver of attorney fees in a settlement agreement pursuant to a § 1983 suit; even a general waiver of "all claims" will not suffice. As a policy matter, this broad language may have the effect of encouraging plaintiffs in civil rights cases to negotiate a settlement without mentioning the issue of attorney fees and then sandbag the defendant by later raising the issue. Nevertheless, this court is constrained to follow *Ashley*'s requirement of an explicit waiver on the subject of § 1988 attorney fees. Consequently, despite the general release language in the Joint Tortfeasor agreement signed by the plaintiffs in this case, the court finds that plaintiffs are entitled to attorney fees under 42 U.S.C. § 1988.

### B. *What Award of Attorney Fees Is Reasonable?*

▮ Having concluded that under current Third Circuit law plaintiffs are entitled to

attorney fees, the court next turns to the process of calculating a reasonable award. The Third Circuit has developed a specific methodology for calculating a reasonable fee award. A district court should first multiply the number of hours reasonably spent on the case by a reasonable hourly rate of compensation. *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir.1990). Then the court should make any adjustments to this "lodestar" amount necessary to result in a reasonable amount of attorney fees. *Id.* First, the court should adjust the lodestar downward if the amount is not reasonable in light of the results obtained. *Id.* (citing *Black Grievance Committee v. Philadelphia Electric Co.*, 802 F.2d 648, 656 (3d Cir.1986)). Second, the court should add together other reducer or enhancer adjustments to the lodestar. *Id.*

▮ The party seeking an award of attorney fees has the burden to prove that its request is reasonable. *Id.* To meet that burden, the party must submit evidence supporting both the hours worked and rates claimed. *Id.* The party opposing the fee award then has the burden to challenge the reasonableness of the fee request. *Id.* A district court cannot decrease a fee award based on factors not raised by the opposing party. *Id.* However, once the opposing party raises objections to the fee request, a district court has a great deal of discretion to adjust the fee award in light of those objections. *Id.*

#### 1. *Calculating the Lodestar*

Plaintiffs' counsel's records show that lead counsel Shachtman spent 340.3 hours litigating this case, associate counsel spent 6.6 hours, a law clerk spent 99.8 hours, and a legal assistant spent 87.8 hours. Sacre does not object to the number of hours spent by counsel as "redundant, excessive, or otherwise unnecessary." *See Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939. However, Sacre does argue that the records contain insufficient detail from which the court can determine a reasonable award of attorney fees. *Id.* ("[w]here the documentation of hours is inadequate, the district court may reduce the

award accordingly"). The court finds that the records of hours spent by counsel in litigating this case contain sufficient detail. Thus, the court will calculate the lodestar using the hours asserted by plaintiffs.

Plaintiffs argue that reasonable billing rates for the community are $215 per hour for lead counsel, $200 for associate counsel, $105 for law clerks, and $85 for legal assistants. Although Sacre also objects to these billing rates, plaintiffs' asserted rates appear appropriate based on the prevailing rates in the community for counsel of comparable experience. *See Lyon v. Whisman*, 1994 WL 827159 (D.Del.1994). In addition, Sacre cites no contemporaneous evidence for the lower rates he proposes. Thus, the court finds that plaintiffs' asserted billing rates are reasonable.

Multiplying the hours worked by the prevailing rates in the community, plaintiffs' lodestar amount of attorney fees equals $92,426.50 (340.3 hours × $215 + 6.6 hours × $200 + 99.8 hours × $105 + 87.8 hours × $85).

## 2. *Adjusting the Lodestar*

Both parties argue that the court should adjust the lodestar amount. Sacre argues that the court should reduce the lodestar because $92,426.50 in attorney fees is unreasonable in light of the minimal results obtained as a result of this litigation. Plaintiffs argue that the court should increase the lodestar by 20% to account for the contingent nature of the case. Following the methodology outlined by the Third Circuit, the court will address Sacre's proposed reduction before plaintiffs' proposed increase.

### a. *Adjusting Downward in Light of Results Obtained*

In *Hensley*, the Supreme Court emphasized that "results obtained" is a crucial factor in determining a reasonable award of attorney fees under § 1988. *Id.* at 434, 103 S.Ct. at 1940. This factor is important because a party may be deemed "prevailing" even though that party only succeeded in some small measure. *Id.* When a party "has achieved only partial or limited success, the product of hours reasonably expended on

the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Id.* at 436, 103 S.Ct. at 1941. In such cases, the district court has discretion to determine a reasonable amount of attorney fees. *Id.* at 437, 103 S.Ct. at 1941. "There is no precise rule for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Id.* at 436–37, 103 S.Ct. at 1941.

### 1) *How Successful Were Plaintiffs in This Litigation?*

■ Attempting to determine the level of plaintiffs' success is difficult when the parties have entered into a settlement agreement. Settlement agreements often dispose of claims in a way that makes it impossible for a court to determine whether a particular claim has been successful or not. As the Seventh Circuit observed in *Illinois Welfare Rights Organization v. Miller*, 723 F.2d 564 (7th Cir.1983), "many settlement agreements will be informally structured with an eye toward the achievement of overall objectives, rather than the disposition of concrete claims." *Id.* at 567. "With these more general settlements, the analysis of *Hensley* regarding successful and unsuccessful claims may be unworkable, although the central teaching of *Hensley*[, that the fee must be reasonable in light of the plaintiff's success,] will still apply." *Id.; see also Black Grievance Committee*, 802 F.2d at 654 (stating that the difficulty of determining the plaintiffs' success on a § 1983 suit was "compounded by the fact that the case was settled rather than fully litigated").

The Joint Tortfeasor Release agreement executed by the parties in this case creates this difficulty. The agreement merely states that it intends "to release Dr. Sacre from all liability aforementioned, including any and all liability for unforeseen, unanticipated, unmanifested, unsuspected and/or feared injuries, claims and demands arising out of [Sacre's medical] treatment." The agreement does not mention the specific claims against Sacre for violations of the Eighth and Fourteenth Amendments, medical negligence, and

intentional infliction of emotional distress. Moreover, Sacre's counsel testified that the settlement "was not broken up between the state claims and federal claims." Thus, it is impossible to determine plaintiffs' level of success on the basis of this general settlement agreement alone.

The court must look to other factors to determine what level of success the plaintiffs achieved. Specifically, the court will look to the strength of the case against Sacre, the amount of monetary relief obtained in relation to relief sought in the entire litigation, and the success against the other defendants in the litigation. It is appropriate to examine plaintiffs' success during the litigation as a whole, rather than merely against Sacre, because plaintiffs are seeking fees that are attributable to claims against all of the defendants.

Plaintiffs' counsel admitted that plaintiffs' case against Sacre was "weak." He interviewed five experts in an attempt to establish liability; two could not testify helpfully, two refused to testify at all, and one ended up working for Sacre. At this point, plaintiffs' counsel felt that the dollar value of plaintiffs' claim against Sacre was "zero" because Delaware law requires an expert to establish medical negligence. Moreover, plaintiffs apparently had no other evidence to prove that Sacre was deliberately indifferent to Swan's condition or had intentionally caused Swan mental distress.

In addition, plaintiffs' recovery of $40,000 for their entire case was small in relation to the amount they sought. Rule 9.4(a) of the Local Rules for Civil Practice and Procedure for the District of Delaware prevent parties from requesting a specific sum for damages in their pleadings. However, plaintiffs in this case undoubtedly sought to recover more than $40,000 in damages against all of the defendants named in their complaint because they requested $100,000 merely to settle their claims against Sacre. In response to plaintiffs' offer of $100,000, Sacre responded with a counteroffer of $40,000, less than half of what plaintiffs offered. Plaintiffs apparently accepted Sacre's counteroffer without question. They have recovered no additional money in their litigation, probably because the court granted a partial summary judgment in favor of the remaining defendants. Although $40,000 is probably a sizeable sum of money to plaintiffs, it does not compare to that which they might have received had they succeeded on the merits of their claims.

Finally, plaintiffs have not fared well against the other defendants in this case. The parties filed a Stipulation dismissing plaintiffs' claims against originally named defendants Free, Williams, Bunting, Tabler, Williams, Patten, and Booker. D.I. 229. In addition, plaintiffs have lost on summary judgment as to Counts I and II of their Amended Complaint against the remaining defendants. Plaintiffs were unable to introduce any evidence establishing that these defendants violated Swan's constitutional rights.

Based on the weakness of the case against Sacre, the small monetary recovery relative to the desired recovery, the dismissal as to some of the defendants, and the loss on summary judgment against the remaining defendants on the constitutional claims, plaintiffs' overall success has been minimal. Therefore, the court finds that $92,426.50 is an unreasonable amount of attorney fees in relation to plaintiffs' success.

### 2) *What is a Reasonable Amount of Fees in Light of Plaintiffs' Limited Success?*

Having determined that the lodestar in this case results in an unreasonable amount of attorney fees, the court must determine what amount is reasonable. Attempting to identify specific hours that should be eliminated from a fee petition in a civil rights case poses a difficult problem. As the Supreme Court noted in *Hensley*, most civil rights cases

> will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

*Id.* at 435, 103 S.Ct. at 1940. Indeed, plaintiffs have argued that this litigation involves a common core of facts and legal issues, making it difficult to separate hours spent pursuing claims against Sacre from those spent pursuing claims against the remaining 13 defendants. Moreover, plaintiffs' counsel has declined the court's invitation to identify a reasonable approach for identifying a proportionate share of the work and expenses that can fairly be attributable to the preparation, presentation, and settlement of plaintiffs' claims against Sacre.

Although the court would have been inclined to begin its analysis of a reasonable fee based on a suggested apportionment by plaintiffs, the court is not inclined to examine counsel's records in an effort to develop such an apportionment. Thus, rather than attempt to eliminate specific hours, the court will make a general percentage reduction of plaintiffs' requested attorney fees in accordance with the principles announced in *Hensley.* *See* 461 U.S. at 436–37, 103 S.Ct. at 1941 (authorizing a general deduction when the court cannot eliminate specific hours); *Institutionalized Juveniles v. Secretary of Public Welfare,* 758 F.2d 897, 925 n. 44 (3d Cir.1985) (stating that a district court may "make a percentage reduction for lack of complete success").

■■■ In an effort to make a deduction that is fair to both parties and that results in a reasonable amount of attorney fees, the court draws guidance from cases in which courts have apportioned attorney fees among multiple defendants. A district court has wide discretion on how to divide liability for attorney fees. *See generally Council for Periodical Distributors Assoc. v. Evans,* 827 F.2d 1483, 1487–88 (11th Cir.1987); *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 959–60 (1st Cir.1984). For example, a court can divide attorney fees equally among the defendants. *Dunten v. Kibler,* 518 F.Supp. 1146, 1159 (N.D.Ga.1981). Alternatively, a court can divide fees according to the relative culpability of the various defendants. *Jose P. v. Ambach,* 669 F.2d 865, 871 (2d Cir. 1982). Finally, a court can award a portion of the plaintiff's fee request when the plaintiff cannot recover attorney fees against one

or more of the defendants. *Southeast Legal Defense Group v. Adams,* 657 F.2d 1118, 1125–26 (9th Cir.1981) (affirming an award of 75% of the plaintiffs' fee request because 25% of the attorney fees were attributable to federal defendants against whom § 1988 does not apply).

■■■ Although the present case does not involve apportioning attorney fees among multiple defendants, the court can apply the general principles behind these apportionment cases here. Thus far, plaintiffs have only "prevailed" against Sacre; they have not prevailed against any of the other defendants. Thus, the court should order Sacre to pay only the portion of the fees that is fairly attributable to establishing his liability.

Although plaintiffs named fourteen defendants in their complaint, the facts of the case reveal that some defendants could be grouped together, leaving five groups: Sacre, ARA, Daniels, Newman, and a group of other correctional defendants. One method of allocating fees might be to divide the time spent in this case equally and order Sacre to pay 20% of the total. However, based on Shachtman's characterization of plaintiffs' claims against Sacre as "weak" and the relative lack of evidence supporting the medical malpractice and deliberate indifference claims, the court finds the time allocated to Sacre should be less than exactly one-fifth. The facts and record in this case show that plaintiffs' claim against Sacre was essentially a medical malpractice claim that could progress only so far because it lacked an expert witness. Based on the above, the court finds that 15% of the total attorney fees is the portion that was reasonably necessary for plaintiffs' counsel to spend in order to obtain the results they did. Consequently, the court will award $13,-863.98 (15% of $92,426.50) as the reasonable and proper amount of attorney fees to which plaintiffs are entitled under 42 U.S.C. § 1988 for litigating the merits of their claims.

b. *Upward Adjustment Based on the Contingent Nature of the Case*

■■■ A court should grant a contingency multiplier only in rare cases. *Rode,* 892 F.2d at 1184. In order to obtain a contingency multiplier, a party must establish: 1) how the

market treats contingency cases differently from hourly fee cases; 2) the degree to which the market compensates for the contingency; 3) that the market rate of compensation is not more than would be necessary to attract competent counsel; and 4) that without a risk adjustment, the prevailing party would have had substantial difficulty in obtaining counsel. *Id.* (citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. 711, 731–33, 107 S.Ct. 3078, 3089–91, 97 L.Ed.2d 585 (1987)).

■ Plaintiffs have failed to offer any evidence satisfying these standards. They have merely submitted an affidavit by lead counsel Shachtman arguing that he undertook "significant risk" because of the tougher legal standards for recovery, the defendants' possible immunity from damages, the complexity of the factual issues, and the advancement of out-of-court expenses. In addition, counsel cited *Aumiller v. University of Delaware,* 455 F.Supp. 676 (D.Del.1978), and argued that on the basis of that case, plaintiffs are entitled to a 20% multiplier. The facts in *Aumiller* differ considerably from the facts in this case, and *Aumiller* was decided before the stricter standards set by *Rode.* In addition, Shachtman's affidavit fails to identify or describe the relevant market for contingency fees, either in the abstract or in relation to plaintiffs' claims. Accordingly, the court will deny plaintiffs' request for a contingency multiplier.

C. *What Is the Reasonable Amount of Out–of–Pocket Expenses?*

Plaintiffs seek $17,679.91 in out-of-pocket expenses. $10,735.32 of this total relates to expert witness fees incurred by plaintiffs, which are not recoverable under § 1988. *West Virginia University Hospitals, Inc. v. Casey,* 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991). However, the remaining out-of-pocket expenses are recoverable as part of reasonable attorney fees under § 1988. *See id.* at 87 n. 3, 111 S.Ct. at 1141 n. 3.

Plaintiffs seek $482.04 for copies of medical records. Plaintiffs also request $640.55 for defending the depositions of plaintiff Mrs. Carello ($481.75) and inmate Brian Greenwell ($158.80). Finally, plaintiffs request $891 for two depositions taken of Sacre ($311.85 and $579.15). The court finds that these expenses were reasonable and necessary to plaintiffs' case against Sacre.

■ Plaintiffs should not recover their total expenses for the remaining depositions and subpoenas, however. Because plaintiffs' case against Sacre was weak and because plaintiffs failed to prevail against the remaining defendants on their constitutional claims, the court will apportion these remaining expenses in the same manner as it has apportioned the lodestar. *See Hensley,* 461 U.S. at 436–37, 103 S.Ct. at 1941; *Institutionalized Juveniles,* 758 F.2d at 925 n. 44; *but see* 758 F.2d at 926 (holding that when awarding costs pursuant to Federal Rule of Civil Procedure 54(b) and § 1988, a court may not deny costs for limited success). The court calculates the recoverable expenses as follows:

| | |
|---|---|
| Martino I | $ 321.75 |
| Free & Pennington | $ 415.35 |
| Martino II | $ 482.63 |
| Zimmerman, Lee, Booker, Bunting, & Kenney | $1152.45 |
| Gudzelak | $ 131.63 |
| Daniels | $ 839.48 |
| Newman | $ 400.73 |
| Brooks | $ 294.00 |
| Smith | $ 289.08 |
| Martino III | $ 198.90 |
| Service of process | $ 405.00 |
| | $4931.00 |
| | × 15% |
| | $ 739.65 |

Thus, the court will award plaintiffs $739.65 for the remaining depositions and subpoenas. The total award of out-of-pocket expenses to plaintiffs equals $2676.20 ($739.65 + $405 + $640.55 + $891), which is about 15% of the total expenses sought.

### D. What Additional Fees Are Reasonable?

Plaintiffs seek $10,247.00 in fees for litigating their fee petition. "Fee petition litigation should be treated as a 'separate entity subject to lodestar and Hensley reduction analysis.'" *Id.* (citing *Institutionalized Juveniles*, 758 F.2d at 924). The court accepts plaintiffs' asserted hours and rates and thus adopts plaintiffs' proposed lodestar. However, based on the fact that plaintiffs have only succeeded in recovering about 15% of their attorney fees and out-of-pocket expenses they sought in their fee petition, plaintiffs have had limited success on that petition. Thus, the court will award 15% of the fees requested for fee litigation, which amounts to $1,537.05.

### III. CONCLUSION

For the reasons set forth by the court above, the court will grant plaintiffs' amended petition for attorney's fees. D.I. 171. The court finds plaintiffs are entitled to $13,863.98 in reasonable attorney's fees, $2676.20 in reasonable out-of-pocket expenses, and $1,537.05 in additional fees. Therefore, the court will award plaintiffs a total of $18,077.23 from defendant Sacre. The court will issue an Order in accordance with this Opinion.

### ATTACHMENT

### JOINT TORTFEASOR RELEASE

**KNOW ALL MEN BY THESE PRESENTS,** that:

1. WE, MATILDA CARELLO, Individually and as guardian by Order of the Court of Chancery, State of Delaware, dated June 10, 1994, of ROBERT J. SWAN, JR., a mentally and physically infirm person, and RALPH P. CARELLO, JR., for ourselves and ROBERT J. SWAN, JR., his heirs, executors, administrators, successors and assigns, in consideration of the sum of Forty Thousand and No One–Hundredths Dollars ($40,000.00), the receipt whereof is hereby acknowledged, do hereby remise, release and forever fully and completely discharge ANTONIO C. SACRE, M.D. and his heirs, executors, administrators and assigns (all collectively, jointly and separately referred to hereinafter as "DR. SACRE"), of and from any and all demands whatsoever, whether known or unknown, in law or equity, by reason of any cause, matter or thing whatsoever, from the beginning of time to the date of these presents; and without limiting the generality of the foregoing, of and from all claims which we asserted, might have asserted or might assert for injuries, damages and/or other losses to us and/or ROBERT J. SWAN, JR. (including both consequential and punitive or exemplary damages) arising out of medical services rendered by DR. SACRE to ROBERT J. SWAN, JR. on or about May 31, 1992 through June 3, 1992, in Gander Hill Prison, Wilmington, Delaware (hereinafter referred to as "the said treatment"), for all of which suit was brought in the District Court for the District of ·   , Delaware, being C.A. No. 94–221–RRM; it being the intention to release DR. SACRE from all liability aforementioned, including any and all liability for unforeseen, unanticipated, unmanifested, unsuspected and/or feared injuries, claims and demands arising out of said treatment.

2. We understand that this settlement is the compromise of a disputed claim and that the payment is not to be construed as an admission of liability on the part of DR. SACRE, by whom liability is expressly denied.

3. We hereby reserve the right to make claim against all other persons and entities not parties to this Release, and we reserve the right to claim that those other persons or entities and not the party herein released are solely liable to us for our injuries, losses and damages.

4. This Release is executed in conformity with the provisions of 10 *Del.C.* § 6301, *et seq.* of the Uniform Contribution Among Tortfeasors Act, and shall be governed by

Delaware law. Accordingly, should it be determined that persons or entities not being released by the terms of this Release are jointly or severally liable to us with said DR. SACRE in tort or otherwise, we agree that the damages recoverable from such other persons or entities shall be reduced to the extent of the pro rata share of DR. SACRE of all damages recoverable by us; that is, damages awarded against all other persons or entities shall be reduced by an amount determined by applying the pro rata share, of legal liability for which the said DR. SACRE is found to be liable as a consequence of the said incident, to the total damages awarded to us. We further agree that the execution of this Release shall operate as a satisfaction to that extent of our claims against such other persons or entities.

If it should appear or be adjudicated in any suit, action or proceeding, however, that DR. SACRE and others jointly caused injuries, losses or damages, to us, then, in order to save DR. SACRE harmless and, as further consideration for the aforesaid payment, the undersigned will satisfy on behalf of DR. SACRE, any decree, judgment or award for any and all damages, including, but not limited to, compensatory damages and punitive or exemplary damages, in which there is such finding or adjudication involving said DR. SACRE; to the extent of the liability of DR. SACRE for contribution for any and all damages, including, but not limited to, compensatory damages and punitive or exemplary damages.

5.a. The foregoing paragraph (Paragraph 4) is intended, at a minimum, to comply with 10 *Del.C.* § 6304(b) so as to preclude any liability of the party herein released to any other tortfeasor, if any, for contribution, or otherwise. Any language of this Release inconsistent with such intent shall be void and of no effect.

b. The foregoing paragraph (Paragraph 4) is also intended to preclude any liability of the party herein released to any other persons or entities for contribution on the basis of any theory of law other than tort.

c. The foregoing paragraph (Paragraph 4) is also intended to relieve the party herein released from the obligation to participate in any other suit, action, or proceeding arising out of this treatment, and we have specifically considered the case of *Winkler v. Balentine*, Del.Supr., 254 A.2d 849 (1969), and specifically agree that the party herein released has no obligation to participate in any other such action.

6. We hereby certify that we have made this compromise settlement and executed this Release with the understanding that we are giving up, waiving, and/or releasing every right, claim, and cause of action which we now have, or ever had or may ever have against the party herein released by reason of the said treatment described above. We declare that the injuries, damages and/or other losses sustained by us and/or ROBERT J. SWAN, JR. are or may be permanent and/or yet unknown or unmanifested and that recovery therefrom is unknown and uncertain. It is understood and agreed that we rely wholly upon our own judgment, belief and knowledge of the nature, extent, effect and duration of said injuries, and cause thereof and liability therefor, and that this Release is made without reliance upon any statement or representation by DR. SACRE or his representatives, the making of any such statements or representations being specifically denied.

7. We also certify that we have reviewed this release with our attorney Douglas A. Shachtman, Esquire.

8. This agreement contains the entire understanding of the parties, and is contractual and not a mere recital; and there are no representations, warranties, covenants, or undertaking other than those expressly set forth herein.

9. Any modification or waiver of any of the provisions of this agreement shall be effective only if made in writing and executed with the same formality as this agreement.

**IN WITNESS WHEREOF,** and intending to be legally bound, the said MATILDA CARELLO and RALPH P. CARELLO, JR., set their hands and seals this 6th day of January, 1995.

IN THE PRESENCE OF:

/s/ Douglas A. Shachtman
WITNESS

/s/ Matilda Carello
MATILDA CARELLO

/s/ Douglas A. Shachtman
WITNESS

/s/ Ralph P. Carello, Jr.
RALPH P. CARELLO, JR.

RE: *Swan v. Sacre*

STATE OF DELAWARE:

NEW CASTLE COUNTY:

**BE IT REMEMBERED** that on this 4th day of April, 1995, personally appeared before the undersigned, a Notary Public in and for the State and County aforesaid, the deponent, who, being by me duly sworn according to law, deposes and says that she is employed in the offices of Burt & Burt, Suite 1700, Mellon Bank Center, 919 Market Street, Wilmington, DE 19801, and that on April 4, 1995 copies of the attached documents were hand-delivered to Douglas A. Shachtman, Esquire, 1200 Pennsylvania Avenue, # 302, Wilmington, Delaware and were deposited in the United States Mail addressed to:

Michael L. Silverman, Esquire
Tybout, Redfearn & Pell
300 Delaware Avenue, # 1110
P.O. Box 2092
Wilmington, DE 19801

Gregg E. Wilson, Esquire
J. Brendan O'Neill, Esquire
Department of Justice
Carvel State Office Building
820 North French Street
Wilmington, DE 19801

William W. Erhart, Esquire
Erhart & Laffey
1225 King Street, # 600
Wilmington, DE 19899–0234

Christopher J. Curtin, Esquire
Sawyer & Akin, P.A.
1600 Chemical Bank Plaza

P.O. Box 25047
Wilmington, DE 19899

/s/ [Signature]

**SWORN TO AND SUBSCRIBED** before me the day and year aforesaid.

/s/ [Signature]
Notary Public